UNITED STATES *v.* ONE 1936 MODEL FORD V-8 DE LUXE COACH, COMMERCIAL CREDIT COMPANY, CLAIMANT.*

No. 10.  Reargued May 1, 1939.—Decided May 22, 1939.

* Together with No. 627, *United States* v. *Automobile Financing, Inc.* On writ of certiorari to the Circuit Court of Appeals for the Fifth Circuit.  Argued May 1, 1939.—Decided May 22, 1939.

*Mr. Gordon Dean*, with whom *Solicitor General Jackson, Assistant Attorney General McMahon,* and *Messrs. Mahlon D. Kiefer* and *W. Marvin Smith* were on the brief, on the reargument and on the original argument in No. 10, and on the argument in No. 627, for the United States.

*Messrs. Duane R. Dills* and *Eugene E. Heaton,* on the reargument and on the original argument, for Commercial Credit Co., claimant in No. 10. *Mr. Duane R. Dills* argued the cause, and *Mr. James F. Kemp* was on a brief, for respondent in No. 627.

MR. JUSTICE MCREYNOLDS delivered the opinion of the Court.

In each of these causes the District Court, proceeding under the "Liquor Law Repeal and Enforcement Act"

of August 27, 1935 (c. 740, 49 Stat. 872, 878, Title 27 U. S. C. § 40a), mitigated the forfeiture of an automobile seized for unlawful transportation of distilled spirits upon which the federal tax had not been paid. (One was seized December 3, 1936; the other, March 15, 1937.) The forfeiture was decreed in a proceeding based upon § 3450 R. S. (Title 26 U. S. C. § 1441). The Circuit Courts of Appeals rightly approved and their judgments must be affirmed.

The facts, undisputed, are essentially alike in both causes. The points of law are the same. A statement based on Record No. 10 will suffice.

The Repeal Enforcement Act provides—

"Sec. 204. (a) Whenever, in any proceeding in court for the forfeiture, under the internal-revenue laws, of any vehicle or aircraft seized for a violation of the internal-revenue laws relating to liquors such forfeiture is decreed, the court shall have exclusive jurisdiction to remit or mitigate the forfeiture.

"(b) In any such proceeding the court shall not allow the claim of any claimant for remission or mitigation unless and until he proves (1) that he has an interest in such vehicle or aircraft, as owner or otherwise, which he acquired in good faith, (2) that he had at no time any knowledge or reason to believe that it was being or would be used in the violation of laws of the United States or of any State relating to liquor, and (3) if it appears that the interest asserted by the claimant arises out of or is in any way subject to any contract or agreement under which any person having a record or reputation for violating laws of the United States or of any State relating to liquor has a right with respect to such vehicle or aircraft, that, before such claimant acquired his interest, or such other person acquired his right under such contract or agreement, which ever occurred later, the claimant, his officer or agent, was informed in answer to his inquiry, at the

headquarters of the sheriff, chief of police, principal Federal internal-revenue officer engaged in the enforcement of the liquor laws, or other principal local or Federal law-enforcement officer of the locality in which such other person acquired his right under such contract or agreement, of the locality in which such other person then resided, and of each locality in which the claimant has made any other inquiry as to the character or financial standing of such other person, that such other person had no such record or reputation."

The following findings by the District Court, it is agreed, correctly set out "the facts in this case"—

The Ford automobile in question was sold by the Greenville Auto Sales, Incorporated (the dealer) October 3, 1936, through its agent, Elrod, to Guy Walker, who in part payment exchanged an old car paid for by him, but registered in his wife's name. He was given terms for payment under a conditional sales contract, drawn by an agent of the dealer, in the name of his brother, Paul Walker, who formally executed the agreement. Guy Walker had the conditional sales contract drawn and executed in the name of his brother in order to place the title "where his wife could not reach it." Paul Walker had no interest in the transaction except to comply with his brother's request. Guy Walker made the transaction with the dealer. He selected the car, made the agreement and handled the transaction himself. Paul Walker drove the car from the dealer's place of business. Guy Walker at the time, and for two or three weeks after the purchase, was living at his brother's house. Only one payment was made on the conditional sales contract before the seizure, and that by Guy Walker to the dealer.

It was admitted that Guy Walker had a previous record and reputation for violating both state and federal laws relating to liquor. Paul Walker was convicted of violating the National Prohibition Act in 1929, and was duly

sentenced therefor, but his record and reputation since serving the sentence were good.

On the date when the sale was consummated the dealer submitted the contract to the Commercial Credit Company, the claimant here, who accepted by telephone, and subsequently on October 5th, in the usual course of business the dealer assigned the contract to the claimant and received a check therefor.

The claimant before accepting assignment of the sales contract made an investigation of Paul Walker by inquiring at the headquarters of the Sheriff of Greenville County, and at the headquarters of the Chief of Police of Greenville, the County and City where the interest was acquired and the locality where Paul Walker resided, as to his record and reputation for violation of the liquor law. Information was received from these offices that he had no such record or reputation. Information was given, however, from the Sheriff's office that Guy Walker had both record and reputation as violator of state and federal laws relating to liquor. No inquiry or investigation was made at the headquarters of the principal federal internal-revenue officer engaged in the enforcement of the liquor laws in that locality, or at the headquarters of any other principal local or federal law enforcement officer of the locality as to Paul Walker, and no inquiry or investigation whatsoever was made of Guy Walker, the admitted real owner and purchaser of the automobile.

The claimant had Paul Walker investigated in August, 1936, by the Business Service Bureau of Greenville, South Carolina, in connection with the purchase of a refrigerator. No investigation at that time was made as to his reputation or record for violating the liquor laws; the investigation did disclose that he had a good reputation in the community where he lived, and this was the reputation given him by his employer at that time.

The claimant purchased the conditional sales contract in good faith, believing that Paul Walker was the pur-

chaser and owner of the automobile. It had no knowledge, information or suspicion of the true facts until after the automobile had been seized by federal officers.

Petitioner challenges the judgment below because of claimant's failure to establish compliance with the conditions imposed by sub-section (b) § 204. Especially because claimant failed to show that it had no reason to believe the automobile was being used or would be used to violate the liquor laws; also because it made no adequate inquiry concerning the record and reputation of the real purchaser—Guy Walker.

Respondent's interest in the automobile is not questioned. It "purchased the conditional sales contract in good faith, believing that Paul Walker was the purchaser and owner of the automobile. It had no knowledge, information or suspicion of the true facts until after the automobile had been seized." This is enough to show compliance with sub-section (b) (1). There was an interest acquired in good faith.

After investigation of the record and reputation of Paul Walker, followed by favorable reports, and believing him to be purchaser and owner of the automobile, claimant in good faith acquired the sales contract. It had no knowledge, information or suspicion that Paul Walker was only a "straw" purchaser. This is enough to show compliance with sub-section (b) (2). The suggestion that since respondent knew automobiles were frequently used for violation of liquor laws it therefore had reason to believe that the one in question would be so used is not well founded. The findings positively affirm that it entertained no such belief or suspicion.

The difficult phrasing of sub-section (b) (3) has produced divergent views concerning its meaning.

In *Federal Motor Finance* v. *United States*, 88 F. 2d 90, 93, the Circuit Court of Appeals Eighth Circuit said—

"We think the fair intendment of the language of sub-section (3) concerning remission of forfeiture is that the

appellant could not rely entirely upon a course of business whereby it acquired an interest in the car so nearly approximating the total value thereof without taking care to ascertain who the real owner was in possession of and using the car."

In the causes now before us (93 F. 2d 771, 773; 99 F. 2d 498, 500), the Circuit Court of Appeals accepted the view that—

"The involved language of subsection (b) (3) of the act does permit the possible interpretation that the lienor is charged with the duty of making inquiry as to every one, bearing a bad reputation or record, who may have a right under the contract of sale, whether or not it appears on the face of the instrument. See Federal Motor Finance v. United States, 8 Cir., 88 F. 2d 90. But in our view Congress did not intend to impose upon the lienor the obligation to ascertain at his peril the identity of every person having an interest in the property and to make inquiry of the law enforcement officers as to the previous record and reputation of every such person, unless from the documents themselves or other surrounding circumstances the lienor possesses information which would lead a reasonably prudent and law-abiding person to make a further investigation."

See also *C. I. T. Corporation* v. *United States*, (Fourth Circuit) 86 F. 2d 311, and *United States* v. *C. I. T. Corporation*, (Second Circuit) 93 F. 2d 469.

Counsel for petitioner now maintain: "That under the language of the statute [(b) (3)] the claimant is required to investigate the real purchaser at its peril and that if it fails to do so, as between it and the Government, the claimant assumes the risk of fraud perpetrated upon it by the dealer and the bootlegger. In any event, the claimant should have been required to show that it at least made a reasonable effort to ascertain who the real

purchaser and user of the car was so that he could be investigated as required by the statute."

Manifestly, § 204 is a remedial measure. It empowers the courts, exercising sound discretion, to afford relief to innocent parties having interests in condemned property where the claim is reasonable and just. Its primary purpose is not to protect the revenues; but this is proper matter for consideration whenever remission is sought. The section must be liberally construed to carry out the objective. The point to be sought is the intent of the lawmaking powers. Forfeitures are not favored; they should be enforced only when within both letter and spirit of the law. *Farmers' & M. National Bank* v. *Dearing,* 91 U. S. 29, 33–35. If any claimant has been negligent or in good conscience ought not be relieved, the court should deny his application.

Consideration of the statutory provisions relative to remissions prior to § 204 and the circumstances of its adoption will enlighten the purpose entertained by Congress.

Sections 3450 and 3453 Revised Statutes (Title 26 U. S. C. §§ 1441, 1620–1621)—derived from Acts June 30, 1864 and July 13, 1866—provide that whenever any commodity in respect of which a tax is imposed, is removed with intent to defraud the United States, it shall be forfeited "and every vessel, boat, cart, carriage, or other conveyance whatsoever, and all horses or other animals, and all things used in the removal or for the deposit or concealment thereof, respectively, shall be forfeited." "The proceedings to enforce such forfeitures shall be in the nature of a proceeding in rem in the circuit court or district court of the United States for the district where such seizure is made." [1]

---

[1] R. S. § 3450 (Act July 13, 1866, c. 184, § 14, 14 Stat. 98, 151; 26 U. S. C. § 1441)—

"(a) Every person who removes, deposits, or conceals, or is concerned in removing, depositing, or concealing any goods or com-

Sections 3460 and 3461 (Title 26 U. S. C. § 1624) derived from Acts July 13, 1866 and June 6, 1872—provide that when goods, wares, or merchandise seized as subjects of forfeiture, do not exceed $500 in value, they may be restored to the claimant upon the execution of a bond and this shall be delivered to the District Attor-

---

modities for or in respect whereof any tax is imposed, with intent to defraud the United States of such tax on any part thereof, shall be liable to a fine or penalty of not more than $500.

"(3) Every vessel, boat, cart, carriage, or other conveyance whatsoever, and all horses or other animals, and all things used in the removal or for the deposit or concealment thereof, respectively, shall be forfeited."

[This section was amended by Act June 26, 1936 (c. 830, Title III, § 325, 49 Stat. 1939, 1955) which changed the provision for $500 penalty to a "fine of not more than $5,000 or be imprisoned for not more than three years, or both."]

Revised Statutes § 3453 (Act June 30, 1864, c. 173, § 48, 13 Stat. 223, 240; Act July 13, 1866, c. 184, § 9, 14 Stat. 98, 111; 26 U. S. C. §§ 1620–1621)—

"All goods, wares, merchandise, articles, or objects, on which taxes are imposed, which shall be found in the possession, or custody, or within the control of any person, for the purpose of being sold or removed by him in fraud of the internal-revenue laws, or with design to avoid payment of said taxes, may be seized by the collector or deputy collector of the proper district, or by such other collector or deputy collector as may be specially authorized by the Commissioner of Internal Revenue for that purpose, and shall be forfeited to the United States. And all raw materials found in the possession of any person intending to manufacture the same into articles of a kind subject to tax for the purpose of fraudulently selling such manufactured articles, or with design to evade the payment of said tax; and all tools, implements, instruments, and personal property whatsoever, in the place or building, or within any yard or inclosure where such articles or raw materials are found, may also be seized by any collector or deputy collector, as aforesaid, and shall be forfeited as aforesaid. The proceedings to enforce such forfeitures shall be in the nature of a proceeding in rem in the circuit court or district court of the United States for the district where such seizure is made."

ney for proper proceedings; if no bond, the articles shall be sold and the proceeds paid into the Treasury. Within a year any claimant may apply to the Secretary for remission which may be granted "upon satisfactory proof, to be furnished in such manner as he shall prescribe: *Provided*, That it shall be satisfactorily shown . . . that the said forfeiture was incurred without willful negligence or any intention of fraud on the part of the owner of said property." [2]

Where the value exceeds $500 or bond is given, forfeiture must be sought in court through a libel in rem.

[2] Revised Statutes §§ 3460 and 3461 (Act July 13, 1866, c. 184, § 63, 14 Stat. 98, 169; Act June 6, 1872, c. 315, § 40, 17 Stat. 230, 257; 26 U. S. C. § 1624)—

"Sec. 3460. In all cases of seizure of any goods, wares, or merchandise, as being subject to forfeiture under any provision of the internal-revenue laws, which, in the opinion of the collector or deputy collector making the seizure, are of the appraised value of five hundred dollars or less, the said collector or deputy collector shall, except in cases otherwise provided, proceed as follows:

. . . . .

"Second. If the said goods are found by the said appraisers to be of the value of five hundred dollars or less, the said collector or deputy collector shall publish a notice, for three weeks, in some newspaper of the district where the seizure was made, describing the articles, and stating the time, place, and cause of their seizure, and requiring any person claiming them to appear and make such claim within thirty days from the date of the first publication of such notice.

"Third. Any person claiming the goods, wares, or merchandise so seized, within the time specified in the notice, may file with the said collector or deputy collector a claim, stating his interest in the articles seized, and may execute a bond to the United States in the penal sum of two hundred and fifty dollars, with sureties to be approved by the said collector or deputy collector, conditioned that, in case of condemnation of the articles so seized, the obligors shall pay all the costs and expenses of the proceedings to obtain such condemnation; and upon delivery of such bond to the collector or

*United States* v. *Two Bay Mules, Etc.,* 36 F. 84; *United States* v. *Mincey,* 254 F. 287; *Logan* v. *United States,* 260 F. 746; *United States* v. *One Bay Horse,* 270 F. 590.

Section 3229 Revised Statutes (Act July 20, 1868, c. 186, § 102, 15 Stat. 125, 166; 26 U. S. C. § 1661) provides—

"The Commissioner of Internal Revenue, with the advice and consent of the Secretary of the Treasury, may

deputy collector, he shall transmit the same, with the duplicate list or description of the goods seized, to the United States district attorney for the district, and said attorney shall proceed thereon in the ordinary manner prescribed by law.

"Fourth. If no claim is interposed and no bond is given within the time above specified, the collector or deputy collector, as the case may be, shall give ten days' notice of the sale of the goods, wares, or merchandise by publication, and, at the time and place specified in the notice, shall sell the articles so seized at public auction, and, after deducting the expense of appraisement and sale, he shall deposit the proceeds to the credit of the Secretary of the Treasury.

"Sec. 3461. Within one year after the sale of any goods, wares, or merchandise, as provided in the preceding section, any person claiming to be interested in the property sold may apply to the Secretary of the Treasury for a remission of the forfeiture thereof, or any part thereof, and a restoration of the proceeds of the sale; and the said Secretary may grant the same upon satisfactory proof, to be furnished in such manner as he shall prescribe: *Provided,* That it shall be satisfactorily shown that the applicant, at the time of the seizure and sale of the said property, and during the intervening time, was absent, out of the United States, or in such circumstances as prevented him from knowing of the seizure, and that he did not know of the same; and also that the said forfeiture was incurred without willful negligence or any intention of fraud on the part of the owner of said property. If no application for such restoration is made within one year, as hereinbefore prescribed, the Secretary of the Treasury shall, at the expiration of the said time, cause the proceeds of the sale of the said property to be distributed according to law, as in the case of goods, wares, or merchandise condemned and sold pursuant to the decree of a competent court."

compromise any civil or criminal case arising under the internal-revenue laws instead of commencing suit thereon; and, with the advice and consent of the said Secretary and the recommendation of the Attorney-General, he may compromise any such case after a suit thereon has been commenced. Whenever a compromise is made in any case there shall be placed on file in the office of the Commissioner the opinion of the Solicitor of Internal Revenue, or of the officer acting as such, with his reasons therefor, with a statement of the amount of tax assessed, the amount of additional tax or penalty imposed by law in consequence of the neglect or delinquency of the person against whom the tax is assessed, and the amount actually paid in accordance with the terms of the compromise."

(Amended, Acts February 26, 1926, c. 27, § 1201, 44 Stat. 9, 126; May 10, 1934, c. 277, § 512 (b), 48 Stat. 680, 759; May 28, 1938, c. 289, § 815, 52 Stat. 447, 578.)

*Wilson Motor Co.* v. *United States,* (Ninth Circuit) 84 F. 2d 630, 632, states—"The government's brief advises that prior to the Act of August 27, 1935, the procedure of the government to afford relief to these innocent owners was under the provisions of compromise powers given the Attorney General and the Treasury under section 1661, 26 U. S. C. A."

In connection with the sections referred to above the United States Code Annotated points to their origin and history.

The National Prohibition Act (October 28, 1919, c. 85, Title II, § 26, 41 Stat. 305, 315, Title 27 U. S. C. § 40) provided that "whenever intoxicating liquors transported or possessed illegally shall be seized by an officer he shall take possession of the vehicle and team or automobile, boat, air or water craft, or any other conveyance, and shall arrest any person in charge thereof." The person

arrested shall be proceeded against but the vehicle or conveyance shall be returned upon execution of a bond. Upon his conviction the court shall order the liquor destroyed "and unless good cause to the contrary is shown by the owner, shall order a sale by public auction of the property seized." [3]  See *Richbourg Motor Co.* v. *United States*, 281 U. S. 528. This was repealed by The Repeal and Enforcement Act, *supra*.

---

[3] "When the commissioner, his assistants, inspectors, or any officer of the law shall discover any person in the act of transporting in violation of the law, intoxicating liquors in any wagon, buggy, automobile, water or air craft, or other vehicle, it shall be his duty to seize any and all intoxicating liquors found therein being transported contrary to law. Whenever intoxicating liquors transported or possessed illegally shall be seized by an officer he shall take possession of the vehicle and team or automobile, boat, air or water craft, or any other conveyance, and shall arrest any person in charge thereof. Such officer shall at once proceed against the person arrested under the provisions of this title in any court having competent jurisdiction; but the said vehicle or conveyance shall be returned to the owner upon execution by him of a good and valid bond, with sufficient sureties, in a sum double the value of the property, which said bond shall be approved by said officer and shall be conditioned to return said property to the custody of said officer on the day of trial to abide the judgment of the court. The court upon conviction of the person so arrested shall order the liquor destroyed, and unless good cause to the contrary is shown by the owner, shall order a sale by public auction of the property seized, and the officer making the sale, after deducting the expenses of keeping the property, the fee for the seizure, and the cost of the sale, shall pay all liens, according to their priorities, which are established, by intervention or otherwise at said hearing or in other proceeding brought for said purpose, as being bona fide and as having been created without the lienor having any notice that the carrying vehicle was being used or was to be used for illegal transportation of liquor, and shall pay the balance of the proceeds into the Treasury of the United States as miscellaneous receipts. All liens against property sold under the provisions of this section shall be transferred from the property to the proceeds of the sale of the property."

The Act of September 21, 1922, (c. 356, § 618, 42 Stat. 858, 987) provides—

"Whenever any person interested in any vessel, vehicle, merchandise, or baggage seized under the provisions of this Act, or who has incurred, or is alleged to have incurred, any fine or penalty thereunder, files with the Secretary of the Treasury if under the customs laws, and with the Secretary of Commerce if under the navigation laws, before the sale of such vessel, vehicle, merchandise, or baggage a petition for the remission or mitigation of such fine, penalty, or forfeiture, the Secretary of the Treasury, or the Secretary of Commerce, if he finds that such fine, penalty, or forfeiture was incurred without willful negligence or without any intention on the part of the petitioner to defraud the revenue or to violate the law, or finds the existence of such mitigating circumstances as to justify the remission or mitigation of such fine, penalty, or forfeiture, may remit or mitigate the same upon such terms and conditions as he deems reasonable and just, or order discontinuance of any prosecution relating thereto."

[Reënacted by Act July 17, 1930, c. 497, § 618, 46 Stat. 590, 757; 19 U. S. C. § 1618.]

The Act May 29, 1928 (c. 852, § 709, 45 Stat. 791, 882, 26 U. S. C. § 1626) extended "the provisions of law applicable to the remission or mitigation by the Secretary of the Treasury of forfeitures under the customs laws . . . to forfeitures incurred or alleged to have been incurred, before or after the enactment of this Act, under the internal-revenue laws."

In the situation disclosed by the foregoing summary, Congress came to consider the Act of August 27, 1935. The Judiciary Committees of Senate and House made reports (Senate Report No. 1330, House Report No. 1601,

74th Cong., 1st Session). In each the paragraphs relative to § 204 (a) and (b) are the same in substance.[4]

[4] House Reports, Vol. 4, 74th Congress, 1st Session, 1935, Report No. 1601, p. 6—

"Section 204 (a) of section 204 provides that in any court proceeding for the forfeiture under the internal-revenue laws of any vehicle or aircraft seized for a violation of the internal-revenue laws relating to liquor, the court shall, upon decree of forfeiture, have exclusive jurisdiction to remit or mitigate the forfeiture. At the present time, the court has authority only to decree the forfeiture, and remission or mitigation is dependent upon administrative action. Section 204 extends to the court which determines whether the vehicle or aircraft shall be forfeited by reason of having been used in the violation of internal-revenue laws relating to liquor, the power to determine whether the claim of any person having an interest in the vehicle or aircraft should be allowed after forfeiture. Thus, in all cases where the value of the seized property exceeds $500, and in all cases where the value is $500 or less, but a bond is posted in order to bring the forfeiture proceeding into court, the court will have exclusive jurisdiction to remit or mitigate the forfeiture. In the event that a bond is not filed in cases where the property is of the value of $500 or less, the power to remit or mitigate will remain in the Secretary of the Treasury.

"Certain standards are given to the court to guide it in this determination. Thus, under subsection (b), the claimant must prove that he acquired his interest in good faith, that he had no knowledge or reason to believe that the vehicle or aircraft was being or would be used in violating Federal or State liquor laws, and that, if his interest arises out of, or is subject to, any agreement under which any person having a record or reputation for violating Federal or State liquor laws has a right with respect to the vehicle or aircraft, the claimant, before he acquired his interest, or before the other person acquired his right, which ever of these events occurred later, inquired of the law enforcement officers in the locality where such other person acquired his right, of the locality in which such other person then resided, and of each locality where the claimant made inquiry as to the character or credit standing of such other person, whether the other person had such a record or reputation, and was informed he had not. This last requirement is predicated upon the

234

A representative of the Treasury Department made a statement to the Senate Judiciary Committee. An extract from this appears in the margin.[5]

A rearrangement of the words of sub-section (b) (3) will enlighten its meaning—

"The court shall not allow the [request]—claim—of any claimant for remission or mitigation, if it appears that .

recognition of the 'bootleg hazard' as an element to be considered in investigating a person as a credit risk. As a matter of sound business practice, automobile dealers, finance companies, and prospective lienholders on automobiles examine records, and make inquiry of references and credit rating agencies as to the owner's or prospective purchaser's reputation for paying his debts and his ability to do so. This subsection merely requires that in the making of such inquiry, the 'bootleg hazard' also be examined as one aspect of the credit risk."

[5] Senate Committee Hearings, 1935, Vol. 495, No. 4, p. 13—

"Section 204. . . . relates to proceedings in court for the forfeiture of vehicles or aircraft seized for violations of internal-revenue laws. At the present time, claimants of interests in vehicles or aircraft that have been seized and forfeited for violation of internal-revenue laws, petition the Secretary of the Treasury for the remission or mitigation of the forfeiture, and the Secretary, under the law, requires the person claiming to have an innocent interest to show that he had no knowledge of the unlawful use of the vehicle or aircraft. What this section will do, in the case of any court proceeding for the forfeiture of vehicles or aircraft, is to give the court jurisdiction to determine whether or not the person claiming to have an innocent interest actually had such an interest. Under the present practice the Secretary of the Treasury requires such a showing. . . . This section is of particular importance in connection with the discounting by a finance company of an automobile dealer's paper.

"At the present time, the Secretary of the Treasury considers that the bootleg hazard is an element involved in the credit risk, and is just as much a part of the investigation by the finance company of a person as a credit risk as is his financial standing in the community. He requires that before a car be returned to the person claiming an innocent interest, the latter must prove that he made an investigation as to whether or not the purchaser had a bootlegger record, and found that he had none."

the interest asserted by [him]—the claimant—arises out of or is in any way subject to any contract or agreement under which any person having a record or reputation for violating laws of the United States or of any State relating to liquor has a right with respect to such vehicle or aircraft, *unless and until* he [the claimant] proves that before [he]—such claimant—acquired his interest, or such other person acquired his right under such contract· or agreement, whichever occurred later, [he]—the claimant—his officer or agent, was informed in answer to his inquiry, at [certain headquarters specified in the alternative] as to the character or financial standing of such other person, that such other person had no such record or reputation."

If the words of § 204 (b) (3) be taken literally, without regard to history or purpose of the enactment, they inhibit remission by the court unless one who claims an interest made actual inquiry concerning every person with record or reputation for violating the liquor laws who in fact (although wholly unsuspected) had acquired some right to the vehicle. There would be absolute forfeiture although the claimant acquired his interest in the utmost good faith and without suspicion of any undisclosed interest; although indeed, he had diligently but unsuccessfully sought information concerning all the facts from every person connected with the transaction. Thus construed the provision would require absolute forfeiture notwithstanding the claimant could not by the utmost diligence ascertain the true situation. No greater reason exists for saying a claimant should be relieved if he made unsuccessful inquiry of the seller concerning undisclosed matters than there is for relief when he had no cause to suspect the existence of an undisclosed interest—no cause to question appearances. A measure requiring absolute forfeiture under such circumstances probably would be expressed in language sufficiently plain to admit no reasonable doubt.

During many years innocent claimants had a clear remedy either by appeal to the discretion of the Secretary of the Treasury or by application for compromise addressed to the Attorney General and Treasury officials (*Wilson Motor Co.* v. *United States, supra*); or under the Prohibition Act, to the court (*Richbourg Motor Co.* v. *United States, supra*). This situation was called to the attention of the Senate Committee by the representative of the Treasury. He also pointed out that before restoring a car the Secretary required that the claimant "must prove that he made an investigation as to whether or not the purchaser had a bootlegger record and found that he had none." The Secretary "considers that the bootleg hazard is an element involved in the credit risk, and is just as much a part of the investigation by the finance company of a person as a credit risk as is his financial standing in the community." The Committee reported in respect of 204 (b) (3)—"This last requirement is predicated upon the recognition of the 'bootleg hazard' as an element to be considered in investigating a person as a credit risk."

These facts indicate that Congress intended a reasonable inquiry concerning the bootleg risk should be made in connection with the investigation of financial responsibility. They negative the notion that a wholly innocent claimant at his peril must show inquiry concerning something unknown and of which he had no suspicion. Dealers do not investigate what they have no cause to suspect.

The forfeiture acts are exceedingly drastic. They were intended for protection of the revenues, not to punish without fault. It would require unclouded language to compel the conclusion that Congress abandoned the equitable policy, observed for a very long time, of relieving those who act in good faith and without negligence, and adopted an oppressive amendment not demanded by

the tax officials or pointed out in the reports of its committees.

Sub-section (b) (3) was intended to prevent remission to a claimant who had failed to inquire when he should have done so, to one chargeable with willful negligence or purpose of fraud. It would be excessively harsh, unreasonable indeed, to say that one dealing in entire good faith must, at his peril, first discover and then make inquiry concerning somebody of whose existence he has no knowledge or suspicion. We cannot think Congress intended thus to burden dealing in all vehicles capable of transporting liquor.

It should be observed that the following things are possible subjects of seizure and forfeiture because of liquor law violations: "Every vessel, boat, cart, carriage, or other conveyance whatsoever, and all horses or other animals, and all things used in the removal or for the deposit or concealment, etc." "Vehicle" is thus defined— "That in or on which a person or thing is or may be carried from one place to another." A wheelbarrow, a covered wagon, a "Rolls-Royce," the patient mule, a "Man of War," and possibly a Pullman car or Ocean Liner is a vehicle. _Goldsmith-Grant Co._ v. _United States_, 254 U. S. 505; _United States_ v. _Two Bay Mules, supra; United States_ v. _One Bay Horse, supra._

Sub-section (b) (3) applies not only to transactions by financial concerns like respondent but to those of individuals and corporations great or small. It contemplates an investigation and this presupposes some reason at least to suspect the existence of the subject of investigation. Congress took away from executive officers the power to mitigate forfeitures where the property exceeds $500 in value, and gave this to the court familiar with the circumstances; but it left with the Secretary of the Treasury discretion to remit when the value was below $500. The intent was to require the courts to exact

proof of inquiries like those demanded by the Treasury Department practice, and disclosed by its representative before the Senate Committee. The petitioner's view, if adopted, would sanction one standard of remission for a vehicle worth $500, another when appraised at a dollar more.

The challenged decrees must be

*Affirmed.*

MR. JUSTICE BUTLER and MR. JUSTICE STONE took no part in the consideration or decision of these causes.

MR. JUSTICE DOUGLAS, dissenting:

MR. JUSTICE BLACK, MR. JUSTICE FRANKFURTER and I think that the judgments below should be reversed.

The problem here involved raises the question of the duty of automobile finance companies to investigate those who purchase cars from dealers, financed by those companies, in order to determine whether the ostensible purchasers are in reality straw men for bootleggers. Here the dealers knew that the named purchasers were only nominal purchasers; and they also knew the identity of the real purchasers. But the finance companies made no inquiry whatsoever of the dealers to ascertain if those purchasers were straw men. They made no inquiry in spite of the fact that the use of straw men by bootleggers was not novel. They made no inquiry in spite of the intimate business relations which exist between them and the dealers and the presumption of availability of such information which that relationship creates. And they now seek the benefit of an Act which the Congress passed to ameliorate some of the risks of confiscation and forfeiture. We do not think they have satisfied the burden which the Congress has placed upon them.

Sec. 204 (a) gives the District Court "exclusive jurisdiction to remit or mitigate" forfeitures. Sec. 204 (b)

sets forth three conditions precedent which the claimant must satisfy before the court may remit or mitigate a forfeiture. To satisfy the third of these conditions claimant must prove under certain circumstances that he made inquiry of designated law enforcement agencies concerning any person for whom a straw man purchaser was acting and that he was informed on such inquiry that such person had no record or reputation for violating the liquor laws. The circumstances under which claimant must make that inquiry exist "if it appears that the interest asserted by the claimant arises out of or is in any way subject to any contract or agreement under which any person having a record or reputation for violating laws of the United States or of any State relating to liquor has a right with respect to such vehicle or aircraft, . . ."

To be sure, the phrasing of § 204 (b) (3) is difficult. But it means to us that a claimant must prove, in order to satisfy that condition, that he made a reasonable investigation to ascertain if the purchaser was a mere straw man acting for another or was a legitimate purchaser in his own right. The words "if it appears" carry that connotation. A contrary construction defeats the purpose of the Congress by placing an enormous premium on lack of diligence. That construction opens wide the doors to defraud the revenue, for finance companies need lift no finger nor make any effort to ascertain the existence of a straw man purchaser. Ignorance now is surely bliss. By failure to make inquiry they can effectively insulate themselves even from the knowledge which their business intimates—the dealers—have. Unless informed by disclosures, in the written contract or otherwise, they can contentedly assume that the purchaser is not a straw man for a bootlegger. That they will thus be voluntarily informed-by the parties or by others seems unlikely. Since the function of the straw

240

man is to conceal the bootlegger, neither the straw man nor the bootlegger can be expected to step forward with the information. And the automobile salesman is not likely to volunteer the information for his desire is to sell automobiles not to defeat sales. On the other hand, the interpretation which we urge would give the statute real meaning and significance in terms of this specific bootleg hazard which concerned the Congress on its enactment.[1]

Furthermore, the requirement for reasonable investigation cannot possibly place such a burden on finance companies as to force us to resolve an ambiguity in statutory language against forfeiture. In the cases before us a single question put the dealer or the purchaser might alone have disclosed the existence of a straw man. But no such simple inquiry was made. An investigation in each case was made to ascertain whether the named purchaser had a reputation or record for liquor violations. But the existence of a straw man was never probed. Certainly on such a matter investigational techniques are not novel, involved or unique. The responsibility for a

---

[1] Precisely the investigation here urged seems to have been intended, for the Report of the Senate Committee on the Judiciary said as respects § 204 (b) (3): "This last requirement is predicated upon the recognition of the 'bootleg hazard' as an element to be considered in investigating a person as a credit risk. As a matter of sound business practice, automobile dealers, finance companies, and prospective lienholders on automobiles examine records, and make inquiry of references and credit rating agencies as to the owner's or prospective purchaser's reputation for paying his debts and his ability to do so. This subsection merely requires that in the making of such inquiry, the 'bootleg hazard' also be examined as one aspect of the credit risk." Sen. Rep. No. 1330, 74th Cong., 1st Sess., p. 6. To investigate the "bootleg hazard" as "one aspect of the credit risk" when inquiry is made of the "prospective purchaser's reputation for paying his debts" seems clearly to entail inquiry as to whether or not the prospective purchaser is a straw man for a bootlegger.

reasonable investigation would add but imperceptibly if at all to the cost of doing business. In this field such investigation entails a burden which any legitimate enterprise should be prepared to carry. We need not conjure up hypothetical cases of extended inquiry which disclosed no straw man, for they would meet the test of reasonable investigation here proposed.

For these reasons, the judgments should be reversed.