## UNITED STATES v. 1–1941 FORD 2 TON TRUCK, MOTOR NO. BB18–6,674,033 et al.

### No. 6473.

United States District Court
W. D. Missouri, W. D.

Jan. 25, 1951.

Sam M. Wear, U. S. Dist. Atty., Harry F. Murphy, Asst., Kansas City, Mo., for plaintiff.

Kenneth C. West, Kansas City, Mo., for Mrs. Marcella.

James Daleo and Mr. Eugene Taxman, Kansas City, Mo., for other defendants.

DUNCAN, District Judge.

On April 14, 1950 the Alcohol Tax Unit raided the premises at 519 Tracy Street in Kansas City, Missouri, and seized all of the property libeled, except the 1949 Lincoln which was seized at a different place. At the time of the raid, Charles Carrollo, Tony Marcella, Sam Tortorice and Michael Arnone were arrested and charged

with conspiracy to violate §§ 3116 and 3253, Title 26 U.S.C.A. The parties arrested were engaged in the business of wholesale liquor dealers without having paid the special tax.

On the day of the raid and the seizure of the property aforesaid, an agent of the Alcohol Tax Unit seized the Lincoln car described, at the home of Tony Marcella at 804 West 64th Street Terrace, which is approximately eight miles from the scene of the raid.

All of the parties entered pleas of guilty to the conspiracy charges, and Carrollo and Marcella were each committed to the custody of the Attorney General of the United States for a period of two years (the maximum penalty for the substantive offense * * * operating a wholesale liquor business without a license) and each fined $1100.00. Defendants Tortorice and Arnone were each given suspended sentences, placed on probation and fined $250.-00 to be paid during the period of probation. The latter two defendants were employees of Carrollo and Marcella.

The scene of the raid and the place where the unlawful activity was being carried on was the home of Mr. and Mrs. Arnone at 519 Tracy, Kansas City, Mo. Mrs. Arnone is the daughter of Carrollo; they live there with their two children; the mother and father of Mrs. Carrollo lives next door at 521 Tracy.

Approximately $50,000.00 worth of liquor was seized, upon which all required Government tax had been paid. The Ford truck was registered in the name of Tony Marcella; the Lincoln in the name of Bessie Marcella; the Buick in the name of Caroline Carrollo; the Chrysler in the name of Sam Tortorice; the Dodge in the name of Anna M. Arnone.

Intervening claims for remission or mitigation of forfeiture were filed by each of the parties in whose name the ownership was vested. Tony Marcella filed such a claim for the Ford truck, the adding machine, the hand truck and the liquor. An offer in compromise in the sum of $12,500.00 was accepted by the Treasury Department with respect to the liquor.

When the case came on for trial, the attorney for Tony Marcella stipulated that the Ford truck, the adding machine and the hand truck had been used in connection with the operation of the business of wholesale liquor dealer without having paid the special tax. Thereupon, the court ordered said truck and the other described personal property forfeited, and proceeded to the trial on the other claims.

At the close of the testimony on the part of the Government, it appeared to the court that the Dodge was sitting in the yard of the premises at 519 Tracy at the time of the raid, but there was no evidence indicating that said car had ever been used in connection with the illegal sale or transportation of any liquor at that place.

There was some evidence on the part of the agent that he had seen a woman take a box which looked like a case of liquor off the porch at one time and place it in the Dodge, but he was unable to say whether or not it was intoxicating liquor, or where it had been taken. There was absolutely no evidence whatsoever to show that the Dodge had at any time been used in connection with the illegal operation of the business.

The court finds that Anna Arnone is the legal owner of said Dodge automobile; that the same had at no time been used in connection with said business, and that her claim for remission or mitigation of forfeiture should be and it is hereby sustained.

The Chrysler automobile was parked in the street near the raided premises; the title thereto was vested in Tortorice. The only evidence respecting the use of said automobile, other than by the owner, was to the effect that at one time Carrollo and Marcella drove up to the premises in said car and thereafter entered said car and left shortly after the Ford truck, apparently loaded with liquor, left the premises during the day. There was no evidence indicating that said automobile was ever at any time in any manner used by any person in connection with the conduct of said wholesale liquor business.

At the close of the plaintiff's testimony, the motion of the claimant was sustained and the libel was dismissed as to said car.

The other two cars present a more complicated situation. The only claim to the Lincoln car on the part of the Alcohol Tax Unit is that it was used on several occasions to convoy liquor from the place of purchase at 519 Tracy through the City of Kansas City to the State of Kansas.

The Government presented as a witness, Wayne R. Trent of Enid, Oklahoma, who was and had been engaged in the liquor business in the State of Oklahoma for many years. He testified that he had made 25 or 30 trips to Kansas City for the purchase of liquor from Carrollo and Marcella, and that on each trip he hauled from 50 to 70 cases.

The liquor which they sold was purchased by Carrollo and Marcella from Kansas City wholesalers, taken to the Tracy Street address, there unpacked and repacked into lugs, which, as the court understands, is a burlap bag containing five 5ths. By so packing, such liquor is much more compact and a great deal larger quantity can be packed or stored in an automobile for transportation.

The witness testified that he always loaded at night and usually left the place of purchase around midnight. His purchases were always in cash, and payment was made at the time he was loaded.

The witness further testified that prior to his purchase of liquor from Carrollo and Marcella, in a conversation with Marcella in Enid, Oklahoma, Marcella stated to him that if he purchased liquor from him, he would see that he was safely convoyed through Kansas City, the inference being that there was danger of the loss of the liquor through hijacking as it passed through that city. Trent testified that in each instance when he purchased liquor, that Marcella and Carrollo convoyed him from the place of purchase on Tracy Street to the State line and saw him safely into the State of Kansas.

Trent testified that on several occasions the Lincoln car was used on such convoy. Trent's own car was also a Lincoln. Trent admitted that he had been engaged in the liquor business in Oklahoma for a number of years. It is the court's understanding that now it is not and was not at the time of these transactions, a violation of the Federal law to transport liquor into the State of Oklahoma, but I think the court may take judicial notice of the fact that during the period of the witness' operation of the liquor business in the State of Oklahoma, that it was a violation of the Federal law to so transport such liquor.

Trent's brother accompanied him on several occasions, and also testified. The testimony of the brother is to some extent corroborative of that of Wayne Trent. Frankly, I was not impressed with that phase of the witness' testimony. Trent testified that on two occasions he had seen Mrs. Marcella at the 519 Tracy premises. The brother testified that someone had told him that Mrs. Marcella was there, but he was unable to identify her in the court room.

The only other testimony concerning the use of the Lincoln car was by a Government agent who testified that on April 12, 1950 a loaded Chrysler car left the premises about midnight; that it was followed by the Lincoln car south to Independence, east on Independence to Troost and south on Troost probably to Meyer Boulevard, and east on Meyer Boulevard to Wornall Road. The Marcella home is about four blocks west of Wornall Road on 64th Street Terrace.

There was no evidence indicating to whom the Chrysler belonged, which was also supposed to have been convoyed or where it went with its liquor. The evidence that the Lincoln was convoying the Chrysler, is not convincing to the court.

The Lincoln car was acquired by Mrs. Bessie Marcella from Evelyn Nigro in April, 1949, over a year prior to its seizure. At the time the Lincoln car was acquired, another car which probably belonged to Tony Marcella was traded as part payment for the purchase price, and Mrs. Marcella borrowed the sum of $2400.00 from the Merchants Bank of Kansas City to complete the purchase price; she signed a note and chattel mortgage on the car to secure the payment of the note. Mrs. Marcella

testified without contradiction, that the balance of the purchase price was thereafter paid by her out of the proceeds of a sale of a farm in which she had an interest. It cannot be successfully disputed that title to the car was vested in Mrs. Marcella.

The Marcella home is a large house located in the southwest part of Kansas City, known as the "Country Club District." The Government's testimony tends to show that on at least two occasions within a month prior to the raid, that Marcella and others drove into the garage of the Marcella home with the Ford truck loaded with liquor; that during their month's surveillance of the premises on Tracy Street, the agents were unable to identify Mrs. Marcella as having been on the premises. She does admit however, that on two or more occasions, pursuant to a call from her husband, she drove to the premises and picked him up to take him home.

The Government contends that Mrs. Marcella had knowledge of the illegal activities of her husband and should not have permitted him the use of her car. She testified that on some occasions he used the car for some errands in connection with the home, but that he did not use it in his business or in his private affairs; that usually Mr. Carrollo came by the house, picked him up and brought him home.

Mrs. Marcella also testified that for a period of approximately ten years prior to the raid, she had been ill and that while at home, she spent a large part of her time in an upstairs room. The Government contends that she must have had knowledge of the illegal activities of her husband's business, because on two occasions the truck was parked in his garage, and that she went to the premises where the illegal activities were being carried on, as heretofore mentioned.

■ Certainly Mrs. Marcella knew that her husband was engaged in the liquor business. The facts at the time of his arrest and conviction, of which the court may take notice, indicated that he was interested in the ownership and operation of three taverns in Kansas City. The Government offered in evidence the record of a conviction of Marcella of violation of a city ordinance in Kansas City, Kansas, in 1924 and contends that his wife should have known that he was likely to violate the liquor laws in the use of her automobile * * * 17 years subsequent to the repeal of prohibition, and 26 years after such violation in 1924.

Moreover, as heretofore stated, the liquor was all tax paid and the only violation of the law was failure to obtain a wholesaler's permit. The home of Mrs. Marcella was approximately eight miles from the scene of the illegal activities. There isn't a suggestion that the Lincoln automobile was ever used in or about the business, except that of a convoy on a few occasions.

The claimant stated that her automobile was in the Berl Berry garage on April 12, the day it was supposed to have been seen convoying the Chrysler loaded with liquor, and she introduced in evidence to sustain her testimony a statement of account showing the date, the nature of the mechanical work and the price thereof.

The evidence is conclusive that not only did Mrs. Marcella have an interest in the Lincoln car, but that she was the owner thereof. There is no substantial evidence indicating that she had any knowledge of the use of her car for illegal purposes, or that she had any knowledge of the illegal nature of the business being conducted at 519 Tracy.

It seems absurd to me that a woman whose husband is engaged in the operation of taverns which is perfectly legal under the laws of the United States and the State of Missouri, should decline to permit the use of her automobile by her husband on the mere suspicion that he might violate some liquor law. It ought to be remembered that we are 17 years from repeal of prohibition.

■ The law recognizes the rights of ownership in property be given to the wife to the same extent as to the husband, and while the relationship of course is closer than in cases wherein the husband-wife relationship does not exist, she ought not to be penalized with respect to ownership of such property simply because she is the wife

of one who may violate the law, without any knowledge on her part.

As I have heretofore stated, the Lincoln car was not in or near the premises at the time of the raid, and after the other property had been seized, one of the agents went to the residence of claimant, eight miles away, and seized her car, in my opinion without any legal justification whatsoever.

As stated, this car was not seized on the premises, but many miles away. Where property is seized and is claimed by another, probably the burden is upon the latter to show ownership. The claimant to the Lincoln has clearly shown that.

It seems to me that the Government has clearly failed to show by convincing evidence that the car was used or intended for use in connection with the business of a wholesale liquor dealer in violation of the law, or that Mrs. Marcella had any reason to suspect that her husband would use her car to violate the laws of the State or nation.

On the contrary, I think that she has shown by her evidence that the car was not used in violation of the Revenue laws and that she had no knowledge or reason to suspect that her husband was engaged as a wholesale liquor dealer without having paid the special tax, and that she had no reason to believe he was violating or would violate the liquor laws of the state or nation in the use of her automobile, even if he had used it as a convoy car.

In United States v. One Ford Coach, 307 U.S. 219, loc. cit. 236, 59 S.Ct. 861, loc. cit. 870, 83 L.Ed. 1249. The court said: "The forfeiture acts are exceedingly drastic. They were intended for protection of the revenues, not to punish without fault. It would require unclouded language to compel the conclusion that Congress abandoned the equitable policy, observed for a very long time, of relieving those who act in good faith and * * * adopted an oppressive amendment not demanded by the tax officials or pointed out in the reports of its committees."

The court further said at 307 U.S. loc. cit. 226, 59 S.Ct. loc. cit. 865: "Forfeitures are not favored; they should be enforced only when within both letter and spirit of the law."

On the contrary: "If any claimant has been negligent or in good conscience ought not be relieved, the court should deny his application."

I think the situation with respect to the claimant on the Lincoln car comes clearly within the policy expressed by the court in the above cited case.

The court therefore concludes that the seizure of the Lincoln was wrongful and hereby sustains the intervening claim for remission or mitigation of forfeiture of One 1949 Lincoln Two Door Cosmopolitan Sedan, Motor No. 9EHO 36,175, dismisses the libel and orders that the car be released and returned to the owner claimant, without cost to her.

The claim with respect to the Buick presents still a different situation. Under the undisputed evidence, this car was used repeatedly to convoy at least the car of the witness Wayne Trent. The property on which the illegal transactions were being carried on was owned by the Carrollos. The Government agents testified that Mrs. Carrollo was on the premises many times during the month of surveillance.

The witness Trent, if he is to be believed, says she was there on many occasions at midnight making coffee and sandwiches for those who were about the place; that she was there on many occasions when he was loading, and that on numerous occasions she accompanied her husband and Tony Marcella in convoying the car out of town.

There is no question about the ownership of the Buick car being vested in Mrs. Carrollo. There is no direct evidence that she had any knowledge that a wholesale liquor business was being conducted without having paid the special tax. One can only draw inferences by her presence on the premises in which her daughter and son-in-law lived, and which was next door to where her mother and father lived, which would cause her to be suspicious of the activities being carried on there * * * i. e., sales were being made in cash and cars

being loaded at midnight and convoyed through the city.

She testified that it was her understanding that the business was legal. It is her testimony against the circumstantial evidence surrounding the general activities of the business. As stated with respect to the Marcella car, the only law violation was the failure to have a stamp. If the parties had seen fit to spend $100.00 for the special tax as wholesale liquor dealers, there would have been no violation of the law.

The mere fact that an Oklahoma bootlegger and other bootleggers in that area and in other communities where the sale of liquor may have been a violation of the law were purchasing their liquor surreptitiously and taking it away under cover of darkness, might not arouse a suspicion that the vendors of such liquor were operating without a Government license. It would be rather natural that the purchasers of such liquor would not desire their presence known in the communities where they operated, and therefore they would operate under cover of darkness.

To one familiar with such business, it might be natural to assume that such persons would be desirous of purchasing their liquor from others than legitimate wholesalers who are required under the law to keep books and records of sales which would be open to inspection by the authorities of the communities where such bootleggers were operating. That fact however, would not necessarily impress itself upon the mind of some person who was not necessarily familiar with the activities of such purchasers of liquor.

It is possible that Mrs. Carrollo did not know that the business was being operated without a Government stamp, it being obvious to her from the containers in which the liquor was stored, that the Government tax had been paid. Mrs. Carrollo testified that she thought her husband was simply lending money to Marcella who was actually conducting the business.

In that connection, it would seem that their activity was too pronounced for such a statement to be given great weight. However, taking into consideration all of these facts, I cannot escape the conclusion that Mrs. Carrollo, because of her close contact with the premises and the business and her presence there, must have suspected that the business was not a legal business, nor can I escape the conclusion that the Buick was being used in connection with the violation of the revenue laws. It will be remembered that the Buick was around the premises where the business was being conducted at the time of the raid, and upon a search of the car, a .38 caliber revolver was found in it.

Unlike the Marcella case, if Mrs. Carrollo did know that the business was illegal, she also knew that her car was being used for the purpose of convoying. Therefore, it must be the conclusion of the court that if the use of the car to convoy the liquor after it was purchased was a part of the transaction, then the car should be forfeited.

As heretofore stated, in his negotiations with the Oklahoma purchaser, Marcella had stated that he would see that the liquor was safely convoyed through Kansas City, and the fact that apparently the transportation of all the liquor purchased by Trent was convoyed through the city, would clearly indicate that the convoy was a part of the consideration for the purchase of the liquor.

It is admitted by the Government that the possession and transportation of the liquor by Trent was in no sense illegal, and this is evidenced by the fact that one of the agents testified that on two occasions a car was stopped after it had proceeded into the State of Kansas, for the purpose of checking the load to determine that it was liquor.

Therefore, any person who simply convoyed the liquor through the streets of Kansas City would not be guilty of a violation of the law and the facility used in such convoy would not be subject to forfeiture, unless it was a part of the illegal conduct of the wholesale business, but in view of the almost undisputed facts with respect to the conduct of the business, the convoy and the use of the car, the court must find that the

Buick car was used in the conduct of the business, and the court having found that Mrs. Carrollo must have suspected the illegality of the business, it was her duty then to refuse permission of her husband to use the car in connection with the conduct of such business.

Repeating the words of the Supreme Court in the Ford Coach case, supra, "If any claimant has been negligent or in good conscience ought not be relieved, the court should deny his application" it would seem under the law that the facts with respect to the Buick car require its forfeiture. I cannot say in good conscience that the Government should have sought the forfeiture of the car in view of the other circumstances in the case, but aside from that, the facts require the forfeiture of the car, and the intervening claim for remission or mitigation of forfeiture of one 1949 Buick Super Sedan Motor No. 53,596,-325 is hereby denied.