**UNITED STATES of America**

v.

**ONE 1956 MODEL 4-DOOR PONTIAC CATALINA AUTOMOBILE, Motor Number A856H1577.**

**Civ. A. 666.**

United States District Court
M. D. Georgia,
Columbus Division.

Oct. 4, 1957.

Joseph H. Davis, Asst. U. S. Atty., Macon, Ga., for the United States.

S. E. Kelly, Jr., Grover C. Willis, Jr., Columbus, Ga., for defendant.

BOOTLE, District Judge.

This libel, filed for the forfeiture of the above described Pontiac, meets with no resistance insofar as the forfeiture is concerned, but General Motors Acceptance Corporation has filed its intervention and claim seeking remission of forfeiture. The libel alleges, and it is not denied, that the vehicle was used, on March 31, 1957, by John Anderson Jenkins and Luvenia Harris Jenkins in violation of law in the removal, deposit and

concealment of two gallons of distilled spirits on which the tax had not been paid.

The evidence discloses the following. Luvenia and John went to the showrooms of Williams Pontiac, Inc., in Columbus, Georgia, twice to look at cars. On one, or both, of these occasions John talked with Meyers, sometimes referred to as the salesman and sometimes as the contact man inasmuch as he did not have authority to close a sale. Luvenia did not talk with Meyers on these occasions. Meyers showed John 8 or 10 cars before John settled on one. Meyers looked upon John as the purchaser because after John settled on a car Meyers carried John home in the new car settled on by John and testified "You know your wife has got to approve before you buy." Arriving at the Jenkins' home, Meyers saw Luvenia for the first time he recalls seeing her. Luvenia approved the car and sent John back with Meyers to see what allowance would be made on her 1951 Pontiac. The record is not clear as to whether John talked with anyone at the Pontiac place other than Mr. Meyers. Mr. Meyers testified that Mr. Young Williams made a proposition and that he, Meyers, carried the proposition to John. John returned home and gave Luvenia a slip with three figures on it indicating total sales price, allowance on trade-in, and balance. Then Luvenia and Meyers went back to the Pontiac place in the new car. She talked with Mr. Young Williams, the dealer's secretary and sales manager, who filled out the customer's statement form showing her name, the name of her husband, John, their address, her status as housewife, no name of any employer for her, but "other income" of $150 per month. Mr. Williams says she told him she had outside jobs and that her daughter would furnish $50 per month on car payments. The customer's statement showed the husband's employment with Akers Motor Lines at $400 per month and her ownership of the home worth $6,000, with no mortgage. Mr. Williams says Luvenia gave

him all of this information. She says she did not tell him her husband made $400 per month, but $60 or $75 a week. She testified that she has not worked in five years and did not tell Mr. Williams she earned $150 a month. She admits telling him that her daughter would provide her with $50 per month which she says her daughter did.

After this interview with Luvenia, Mr. Williams, knowing that a certain group of Jenkins in the community were dealers in whisky, telephoned the sheriff and asked if there was a liquor record or reputation as to Luvenia Jenkins, giving the sheriff her address and telling him that she was a housewife. He did not further identify her as being John Jenkins' wife or otherwise. The sheriff replied that the name Jenkins struck a bell with him and that Williams had better let him check. The sheriff checked and found no record and no record of any reports and so advised Mr. Williams, telling him that he found no record and that he had received no complaints on her and that as to her there was no record or reputation. The sheriff knew that John Jenkins had a liquor reputation, but he was not asked about John and did not know, and was not advised, that Luvenia was John's wife. Mr. Williams says he did not tell the sheriff that Luvenia was John's wife and that the sheriff did not ask him, that he had no reason to ask about John, that he was selling to her and that he was in business to sell cars, not to find reasons not to sell them.

After this telephone conversation, the sale was consummated in Luvenia's name for a total time price of $4,045 with a cash down payment of $300.10 and an allowance for Luvenia's 1951 Pontiac of $821.30, leaving a time deferred balance of $2,923.60. Luvenia's money paid for the 1951 Pontiac and her money received as insurance on a former husband's life made the $300.10 down payment on the new car. The conditional sale contract signed by Luvenia was, by Williams Pontiac, Inc., assigned to General Motors

Acceptance Corporation, the claimant, on the same date on which the sale occurred, namely, October 29, 1955.

Both Luvenia and John have reputations as persons dealing in non-tax-paid liquor and both have records of convictions under laws relating to non-tax-paid liquor. Luvenia, as Luvenia Watts, was convicted under said laws on September 22, 1951 and John was convicted under said laws on April 3, 1954. As alleged in the libel, this car was seized from Luvenia and John for violation of said laws on March 31, 1957.

Admittedly, the claimant made no inquiry as required by Title 18 U.S.C.A. § 3617(b) (3), unless it can be said that Mr. Williams, as secretary and sales manager of Williams Pontiac, Inc., in inquiring of the sheriff was inquiring as an agent of claimant. For their contentions that Mr. Williams was inquiring as agent for claimant, claimant relies upon certain language in the GMAC Manual and upon the course of conduct of this dealer and claimant pursuant to that manual. The Government insists that no such agency can be spelled out of the manual or the conduct of the parties. The pertinent portions of the manual are found on page 5 and page 30. Page 5 sets forth a form of financial statement to be used by a dealer in making application to operate under the GMAC plan. It contains this sentence, "It is understood by the dealer that the officers and representatives of GMAC are not authorized to enter into or consummate any transaction other than the purchase and acquisition of retail and wholesale paper under the respective GMAC Plans." The usual assignment of conditional sale contracts from dealer to General Motors Acceptance Corporation, and the one used in this case, contains an unlimited guaranty by the dealer of payment of the full amount remaining unpaid on the conditional sale contract. Page 29 of the Manual provides for a limited assumption of a portion of the responsibility in certain events by General Motors Acceptance Corporation, and page 30 of the Manual says, "GMAC's assumption of responsibility, to the extent provided in the preceding sections, is conditioned on the following * * * That an investigation was made by the dealer and it indicated that the customer was not engaged in any business or occupation that is in violation of State or Federal laws."

I cannot agree that this language makes the dealer and/or its agent the agent of GMAC. It will be noted that it is optional with dealer whether it makes any inquiry. Also, it is optional with dealer whether it will offer to sell the conditional sale contract to GMAC. If the dealer decides that it will offer the contract in any particular case to GMAC it even then is not obligated to make the investigation suggested in the quoted language. It need do so only if it decides to rely upon and accept GMAC's offer to assume a portion of the responsibility. Insofar as the Manual language is concerned, if the dealer makes the investigation it is doing so on its own in order to take advantage of GMAC's offer to assume a portion of the responsibility. It will be noted also that the investigation mentioned in the Manual falls far short of the investigation called for by Title 18 U.S.C.A. § 3617(b) (3). It would seem that if GMAC had desired to make the dealer, all dealers everywhere, its agent to make this important specified statutory investigation it would have spelled out in the Manual fully and precisely the inquiry it desired its agent to make and that such inquiry as so specified would be one which would meet all requirements of the statute. I cannot agree that General Motors Acceptance Corporation would rely upon a course of conduct or casual conversational remarks to constitute dealers its agents for the purpose of making these inquiries. Nor can I find that the course of conduct or dealings between this dealer and GMAC created such agency. While there is some loose testimony to the effect that when Mr. Williams telephoned the sheriff it was his understanding that he was checking both for Williams Pontiac, Inc. and General Motors Acceptance Corporation, that he was protecting himself as

well as them and that he was acting for both, he testified also that the agreement was all in the Manual. The evidence does not convince that aside from the language of the Manual itself the agency relationship was ever created and I do not think the language of the Manual creates such agency. Footnote 1, in the case of United States v. Chieftain Pontiac Co., 10 Cir., December 21, 1954, 218 F.2d 115, 116, says: "The GMAC carried the automobile paper for the intervener and upon request it customarily made the necessary investigation of the purchaser before the sale was made." If we assume that GMAC, in 1954, used in Oklahoma the same Manual here involved, apparently the Manual was not construed or relied upon as creating the agency here contended for.

It follows, therefore, that unless Mr. Young Williams was agent for GMAC as well as for Williams Pontiac, Inc., GMAC has failed to make the required inquiry and this Court has no jurisdiction to entertain its claim.

 Had I reached the opposite conclusion with respect to the alleged agency the result in this particular case would be the same. As was held in Beaudry v. United States, 5 Cir., 106 F.2d 987, 988, "even where the minimum statutory conditions are complied with, if there are facts and circumstances which give an unsatisfactory color or character to the transaction", the District Court is not compelled to exercise his discretion so as to remit a forfeiture. The statute not only requires the inquiry above referred to, but places upon the claimant in all cases the burden of proving that he acquired his interest in good faith and that he had at no time any knowledge or reason to believe that the vehicle was being, or would be, used in the violation of laws. Under the particular facts of this case, I cannot conclude that Williams Pontiac, Inc. was without knowledge or reason to believe that this car would be used in violation of the whisky laws. John Jenkins was at least as active, if not more active, in the purchase negotiations than

was Luvenia. His interest in promoting the purchase was well known to the dealer. The salesman, or contact man, Meyers, dealt exclusively with him. John selected the car and, with Meyers, took it home for Luvenia's approval. Apparently, John did not talk with Mr. Williams, the dealer's secretary and sales manager, but what knowledge Meyers acquired is imputed to the dealer the same as what knowledge Williams acquired. In his interview with Luvenia, Mr. Williams acquired knowledge that Luvenia was only a housewife with no regular employment or employer, with "other income" of $150 per month, the source of which was completely unidentified. He knew at the time that there were some Jenkinses in the community who were involved in the liquor business and when he telephoned the sheriff he was told in substance that the name Jenkins would have to be checked. Yet with this information, he did not inquire about John Jenkins, who, he knew, was Luvenia's husband, nor did he inform the sheriff that Luvenia, about whom he was inquiring, was Luvenia Jenkins, the wife of John Jenkins. This limited inquiry is explainable, and is explained by Mr. Williams' testimony that he was in business to sell cars not to find reasons not to sell them. It may be said that the dealer was not required to make inquiry concerning Luvenia's husband, but the failure to do so is a matter which the Court may consider in determining whether, under all of the facts and circumstances, claimant faces a hardship brought on through no lack of care on its part and from which it should be relieved. United States v. One Ford Coach Automobile, D.C.W.D.Va., 20 F.Supp. 44. As was suggested in the case last cited, it may be that this dealer was able to remain in a favored state of ignorance only because it refrained from seeking knowledge and hence its position is not one to appeal to the sympathetic consideration of the Court. Of course, any knowledge or lack of diligent inquiry on the part of the dealer is attributable to claimant under claimant's contention that the dealer was

its agent. Beaudry v. United States, *supra*, headnote 2.

Both the dealer and the sheriff knew that Jenkins was a whisky name. The sheriff knew that John Jenkins had a whisky reputation. The dealer knew that John was Luvenia's husband. The least inquiry of the sheriff, therefore, concerning John would have disclosed John's reputation. With such knowledge imparted to the dealer, who knew, of course, of John's interested activity in the selection and purchase of this car, it could hardly be said that the dealer had no reason to believe that it would be used illegally. See in this connection, United States v. One Chrysler Sedan, Motor No. C77048, D.C.M.D.Pa., 18 F.Supp. 684; United States v. 1938 Buick Sedan, etc., D.C.Minn., 24 F.Supp. 739; United States v. Automobile Financing, Inc., 5 Cir., 99 F.2d 498, affirmed 307 U.S. 219, 59 S.Ct. 861, 83 L.Ed. 1249; United States v. One 1935 Plymouth Sedan Automobile, etc., D.C.W.D.Ky., 36 F.Supp. 261; United States v. One 1947 DeSoto Sedan, D.C.W.D.Mo., 87 F.Supp. 1005; C. I. T. Corporation v. United States, 4 Cir., 86 F.2d 311, and United States v. One 1941 Ford Coach Automobile, etc., D.C.W.D.Va., 42 F.Supp. 246.

Accordingly, the United States Attorney may prepare an order forfeiting the vehicle and denying claimant's claim.