## UNITED STATES v. ONE 1937 MODEL CHEVROLET SEDAN AUTOMOBILE, MOTOR NO. 273837.

### No. 39.

District Court, W. D. Tennessee, W. D.
Feb. 21, 1940.

C. P. J. Mooney, Asst. U. S. Atty., of Memphis, Tenn., for the United States.

Royden Dixon, of Memphis, Tenn., for petitioner L. H. Dille Investment Corporation.

MARTIN, District Judge.

L. H. Dille Investment Corporation petitions for remission of forfeiture of one 1937 model Chevrolet sedan automobile, Motor Number 273837, which on June 15, 1939, was ordered attached in this libel in rem proceeding filed by the United States District Attorney, pursuant to Section 3321 of the Internal Revenue Code 26 U.S.C.A. (3450 Revised Statutes of the United States), on allegations of the Government that the automobile was being illegally used for removal of charcoal and sugar to an unregistered and unbonded distillery with intent to defraud the United States of the tax on distilled spirits there produced.

The petitioner, an automobile finance company, for a valuable consideration, acquired title to the automobile by purchasing the conditional sale instalment contract covering it from J. S. Smythe, an automobile dealer of Memphis, Tennessee, who sold the car to one Remus Overton.

The petitioner avers that Remus Overton was a person of good reputation at the time he purchased the automobile and also at the time petitioner purchased the contract; that Overton had no record or reputation for violating the liquor laws either of the United States or of the State of Tennessee, or any other state; that neither the petitioner nor the seller of the automobile had any knowledge or reason to believe that the automobile was being or would be used in violation of law and that the interest of petitioner in the vehicle was acquired in good faith.

The petitioner prays for remission of forfeiture, dismissal of the libel and release of the automobile to petitioner pursuant to its claimed rights under Act of Congress, August 27, 1935, Chapt. 740, Sec. 204, 49 Stat. 878 (Public Act 347, 74th Congress), 27 U.S.C.A. § 40a, et seq.

### Government's Proof.

On the trial of the case, the Government introduced three witnesses.

W. M. Pugh, Alcohol Tax Unit Investigator of the Bureau of Internal Revenue, Treasury Department, testified that on April 26, 1939, he and other officers of his unit raided a wild-cat distillery located about one and one-half miles from the highway in Wolf River Bottoms south of the Raleigh-LaGrange Road which had been operated there for some time; and that four negroes were around the still, two of whom escaped when the revenue officers closed in, and two of whom, Jim Farmer and Will Hall, were arrested; that through information given them by Farmer, they located and seized the automobile in controversy and found charcoal dust and remnants of sugar and meal on the floor of the car, and a coat containing papers which identified the owner of the car as Remus Overton, and letters of recommendation certifying the good qualities of Overton.

The investigator further testified that at the time of the raid, he had never heard of Remus Overton and that there was no record against him in the Department; but that during a subsequent raid in Fayette County, Overton escaped the officers and is still a fugitive.

Jim Farmer, who had been sentenced on guilty plea in this court, testified that the fugitives Will Thomas and Remus Overton were operating an unlawful distillery near Cordova, Shelby County, Tennessee, in January 1939, and hired him to move it; that they continued to operate the still at several sites until the raid of April 26, 1939. (The seizure of the automobile occurred eleven days after its purchase on April 15, 1939).

The convict Farmer further testified that Overton, Thomas and Hall had used the automobile to transport charcoal, sugar and meal, and that the witness had used his wagon to carry the commodities from the automobile to the still.

The third Government witness, Sergeant J. J. Elmore, Chief of the Liquor Squad of the Memphis Police Department, testified as follows:

"Q. Do you know by reputation one Remus Overton? A. Yes, sir; my information is that he is a whiskey maker and a whiskey hauler.

"Q. About when did you begin hearing that? A. Well, possibly my best recollection would be about two years ago.

"Q. You began hearing two years ago that Remus was a whiskey maker and hauler? A. Yes, sir.

"Q. Was he supposed to be operating in Memphis, Shelby County, Tennessee? A. I had information that he was operating in the North end, but I never did catch him."

He testified that he made no written memorandum or any oral report to his superior officers, concerning his suspicion of Remus Overton.

### Petitioner's Evidence.

J. S. Smythe, the automobile dealer who sold the car to Remus Overton, testified that until about two days before the date of the contract he had never seen, known or heard of the latter. Overton had come to his place of business and negotiated for the purchase of an automobile; that after terms of agreement were reached and Overton had signed a "Customer's Statement", they went to the office of the petitioner where vice-president Hendricks was asked whether his company would purchase the contract; that Mr. Hendricks questioned Overton, examined the car and referred the customer's statement to a company employee, Miss Callie Smith, for investigation; that she reported satisfactorily; whereupon Mr. Hendricks agreed to buy the contract, and the transaction was consummated.

The witness admitted that he made no investigation whatever of Overton, but that he sold the automobile to him in good faith, and delivered the car only after petitioner had agreed to purchase the contract, and that he left the matter of investigating Overton entirely to the L. H. Dille Investment Corporation. He swore that he had no knowledge or intimation that the automobile would be used in violation of the laws of the United States, or of any state relating to liquor.

It is important to observe that he neglected and failed to answer the only two questions asked on the face of dealer's warranty representation, recommendation, assignment and guaranty, made part of the conditional sale contract, towit:

"1. Have you any reason to believe purchaser violated any laws concerning liquor or narcotics? ——— (Answer, Yes or No).

"2. Do you know, or have you any reason to believe, Purchaser's name was ever rejected by any other Finance Company, Bank or Banker in any transaction? ——— (Answer Yes or No)."

The witness automobile dealer explained that he had entirely overlooked the questions; that this was the first contract he had ever sold to petitioner and that no other contract he had ever sold to any other finance company contained such questions.

E. E. Hendricks, vice-president of the petitioner company, L. H. Dille Investment Corporation, corroborated the witness Smythe as to the transactions between them. He admitted delegating the investigation of Remus Overton to the company employee, Miss Callie Smith, who reported her investigation satisfactory. He admitted that he did not call the Sheriff, the Chief of Police, or the Alcohol Tax Unit; but denied any knowledge or reason to believe that the automobile would be used in violation of the laws of the United States or of any state relating to liquor, and testified that he purchased the conditional sale contract in good faith. He stated that in all cases where he has any reason for suspicion, he either calls the designated officers or rejects the paper.

He swore that, after the seizure of the car by the Alcohol Tax Unit, he called the Sheriff of Shelby County and the Chief of Police of Memphis, who informed him that Remus Overton had no record or reputation with them. He testified that Overton had purchased cars through General Motors Acceptance Corporation, Commercial Credit Company, and Kensinger Chevrolet Company, and had fulfilled his obligations, and that his company "had this negro on two previous accounts, and believed him to be of good reputation", and that "previous dealings were satisfactory." The quoted comments were written by the witness on the customer's statement before he purchased the Overton conditional sale contract.

Miss Callie Smith testified that a part of her duties as employee of the petitioner company consisted in inquiring by telephone concerning prospective purchasers; that, upon the instruction of Mr. Hendricks, she called by telephone the references listed by Remus Overton, namely, another finance company, two furniture companies, a clothing company, and T. G. Uhlhorn, and that their reports were satisfactory. She stated that Mr. Ohlhorn told her over the telephone that Remus Overton was at that time employed by him at a wage of $1.50 per day—a slim earning power, it would seem, with which to contract for the purchase of an automobile.

Mr. T. G. Uhlhorn, himself, testified that Overton had worked for him off and on for seven or eight years, driving a truck and working on a farm; that the darky had worked for him until about four months prior to the seizure of the automobile and

had come to him shortly before April 15, 1939, and asked for a recommendation of Overton for the purchase of a truck. He asserted that when Miss Smith telephoned him about Overton, the witness thought when he recommended Overton that the latter was purchasing the truck which he expected Overton to use, among other ways in hauling materials to a subdivision which Mr. Uhlhorn was managing. He testified further that Overton was a good worker, concerning whom he had never heard any evil report or had any suspicion of liquor law violation.

It was stipulated that another automobile dealer, Herman Robinson, if called, would testify that his company, Kensinger Chevrolet Company, had sold an automobile to Remus Overton, that the account had been paid out satisfactorily, and that he had never heard that Overton had a record or a reputation as a bootlegger.

It was further stipulated that Remus Overton had never been previously convicted of bootlegging; and that the Sheriff of Shelby County, Tennessee, his Chief Deputy, and the Chief of Police of the City of Memphis knew nothing one way or the other about Remus Overton.

The foregoing narrative of the evidence and stipulations constitutes the findings of fact of this court.

In support of their position, counsel for petitioner cite an opinion of this forum court, which was one of the first construing 27 U.S.C.A. § 40a(b). United States v. One 1935 Ford Standard Coach Automobile, Motor No. 18—179962, D.C., December 17, 1935; 13 F.Supp. 104. Counsel correctly state that this decision was cited approvingly for comparison by the Court of Appeals for this circuit in Universal Credit Company v. United States, 6 Cir., June 28, 1937, 91 F.2d 388, 391. Counsel cite, also: United States v. One 1936 Model Ford V-8 DeLuxe Coach, Commercial Credit Company, Claimant, May 22, 1939, 307 U.S. 219, 59 S.Ct. 861, 83 L.Ed. 1249; United States v. C. I. T. Corporation, 2 Cir., 1937, 93 F.2d 469; United States v. One 1935 Chevrolet, D.C.Maine, 1936, 13 F.Supp. 986.

The early construction of the statute by this court is believed to be consistent with the foregoing cases and also with the appellate court decisions cited by Government counsel: C. I. T. Corporation v. United States, 4 Cir., Nov. 9, 1936, 86 F.2d 311; United States v. One 1937 Model Ford Automobile, D.C.Ky., E.D. 22 F.Supp. 385; United States v. One Dodge Truck, 2 Cir., 88 F.2d 613.

In the 1935 opinion of this district court, cited supra, it was said (13 F.Supp. at page 107): "Should there be any reasonable suspicion to put an automobile finance company upon sensible inquiry, it would unquestionably be the duty of the finance company to make inquiry of the chief of police and other designated officials as to the reputation of the purchaser of the automobile."

The Sixth Circuit Court of Appeals in the Universal Credit Company case, supra, said (91 F.2d at page 391): "A rigid investigation is not required where there is no reason to suspect the purchaser of the car. The evident meaning of the statute is that such an investigation is required in cases where the suspicion of the financing company should be aroused by facts which come to its attention." It is important to observe that the court said that the conceded fact that the purchaser of the automobile "had no reputation as a violator of the liquor laws shows that appellant [the finance company] had no constructive knowledge of any intended improper use." Furthermore, the motor company which assigned the contract had answered negatively the question, "Have you any reason to believe Lessee violates any laws concerning liquor or narcotics?" 91 F.2d at page 390.

The case is plainly distinguishable in salient facts from the case at bar. Here, the purchaser of the automobile, according to the testimony of the sergeant of police in charge of the liquor squad, had a reputation as a "whiskey maker and a whiskey hauler." Moreover, the automobile dealer who assigned the conditional sales contract to the petitioner in the instant case neglected to answer the material question asked on the face of the document: "Have you any reason to believe Purchaser violated any laws concerning liquor or narcotics?"

A well reasoned decision, C. I. T. Corporation v. United States, 4 Cir., 86 F.2d 311, 312, seems plainly in point. The District Court was affirmed in its refusal to remit the forfeiture of an automobile seized by the federal officers for violation of internal revenue liquor laws, where the purchaser had failed to answer, on the conditional sales documents, the question: "Have you ever used a car or do you intend to use above car to transport alcoholic beverages, or have you had any difficulty respecting prohibition or enforcement laws?"

Commenting upon the purchaser's failure to answer the question, the court said, (86 F.2d at page 314): "It thereupon became the duty of the claimant to make inquiry and ascertain why the question was not answered and to investigate all other circumstances surrounding the purchaser and his occupation which might throw light upon the possible use of the vehicle."

The appellate court added, "The court [District Judge] found that had such an inquiry been made, the claimant would have had reason to believe that the car would be used for improper purposes, and since there was evidence to justify this finding, the claimant failed to prove, as required by the second condition of the act, that it had no reason to believe that the vehicle would be used for unlawful purposes."

The court wisely said, moreover: "It does not follow that the claimant might shut its eyes to facts which in the course of the transaction came to its attention."

In the case for decision here, the finance company made only a cursory investigation by telephone, and neglected wholly to make any inquiry at all as to the bootlegger hazard, notwithstanding the red signal apparent in the failure of the automobile company to answer the pertinent question concerning its reasonable belief as to the violation by the purchaser of liquor or narcotic laws.

This court is of opinion that a reasonably prudent investigation of the purchaser in the light of the facts found would have led to the reasonable belief that the automobile would be used by Remus Overton in violation of liquor laws. His low earning capacity coupled with the reputation given him by Sergeant Elmore are quite significant.

In United States v. One 1937 Model Ford Automobile, D.C.Ky., E.D., 22 F.Supp. 385, Judge Ford held in substance, with respect to the failure of an automobile dealer to answer a like question to that unanswered in the instant case, that this was an obviously suspicious circumstance, the failure to investigate which is inexcusable.

In a rather recent case, United States v. One 1937 Ford Truck, D.C.N.D.Ohio, July 27, 1939, 29 F.Supp. 278, 280, Judge Wilkin held that the time of night when an automobile was borrowed "would alone suggest to a careful and diligent owner that he ought to ask what use was to be made of it." He concluded his opinion: "Since the owner failed to make the investigation required by the statute under which he claims remission, the court must deny the prayer and dismiss the intervening petition, and it is so ordered."

It is thought that the opinion of the Supreme Court in United States v. One Ford Coach, 307 U.S. 219, 59 S.Ct. 861, 83 L.Ed. 1249, does not support the contention of petitioner; but on the contrary recognizes the destructive effect upon its right to remission resultant from petitioner's neglect to investigate the bootlegger hazard in the circumstances of the case at bar.

The important fact appears from the opinion of the Supreme Court, 307 U.S. at page 223, 59 S.Ct. at page 863, 83 L.Ed. 1249, that the "claimant before accepting assignment of the sales contract made an investigation of Paul Walker [whose name appeared in the conditional sales contract as purchaser of the automobile involved in the litigation] by inquiring at the headquarters of the Sheriff of Greenville County, and at the headquarters of the Chief of Police of Greenville, the County and City where the interest was acquired and the locality where Paul Walker resided, as to his record and reputation for violation of the liquor law. Information was received from these officers that he had no such record or reputation." Guy Walker, brother of Paul, had made the transaction with the automobile dealer. Guy had a previous record and reputation for violating both state and federal laws relating to liquor. He was unknown to petitioning company in the transaction and was, of course, not investigated. The court in affirming remission of the forfeitures said (307 U.S. at page 237, 59 S.Ct. at page 870, 83 L.Ed. 1249): "It would be excessively harsh, unreasonable indeed, to say that one dealing in entire good faith must, at his peril, first discover and then make inquiry concerning somebody of whose existence he has no knowledge or suspicion. We cannot think Congress intended thus to burden dealing in all vehicles capable of transporting liquor."

In quoting from the decisions in United States v. One 1936 Ford Coach, 4 Cir., 93 F. 2d 771, 773, and United States v. Automobile Financing Co., 5 Cir., 99 F.2d 498, 500, which were affirmed, the Supreme Court approved the following language qualifying immunity from the drastic effects of failure to inquire of law enforcement officers: "Unless from the documents themselves or other surrounding circumstances the lienor possesses information which would lead a reasonably pru-

dent and law-abiding person to make a further investigation."

Moreover, the Supreme Court said (307 U.S. at page 237, 59 S.Ct. at page 870, 83 L.Ed. 1249): "Subsection (b) (3) was intended to prevent remission to a claimant who had failed to inquire when he should have done so, to one chargeable with willful negligence or purpose of fraud", and (307 U.S. at page 226, 59 S.Ct. at page 865, 83 L.Ed. 1249), "If any claimant has been negligent or in good conscience ought not [to] be relieved, the court should deny his application."

By this token, the petitioner in the instant case is entitled to no relief. The petition for remission of forfeiture will be denied and an appropriate judgment will be drawn for entry.