**UNITED STATES of America, Appellant,**

v.

**The SOUTH HALF OF LOT 7 AND LOT 8, BLOCK 14, KOUNTZE'S 3RD ADDITION TO THE CITY OF OMAHA, etc., et al, Appellees.**

No. 88–2212.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 12, 1988.

Decided June 1, 1989.

Rehearing Granted Aug. 8, 1989.

Steven A. Russell, Asst. U.S. Atty., Lincoln, Neb., for appellant.

James Davis, Omaha, Neb., for appellees.

Before HEANEY and FAGG, Circuit Judges, and HANSON,* Senior District Judge.

HANSON, Senior District Judge.

The government appeals the order of the District Court, the Honorable Lyle E. Strom presiding, dismissing 13 separate forfeiture actions involving real property brought by the government pursuant to 18 U.S.C. § 1955(d). The District Court held that real property was not subject to forfeiture under section 1955(d) and that it was inconceivable that the government had authority under this law to seize real property as it had in these cases. We find that real property is excluded from the reach of section 1955(d) and that the procedure used to seize the real property in these cases was constitutionally deficient. Accordingly, we affirm the order of the District Court.

## FACTS

In early March of 1988 the United States filed 13 complaints for forfeiture against certain real properties in Omaha, Nebraska, alleging that the properties, which included personal residences, were used in violation of 18 U.S.C. § 1955. All of the complaints were identical in format. Each contained only a general nonspecific allegation, predicated on information and belief, of how the property was being used in violation of section 1955. Specifically, paragraph six of each complaint alleged simply that the property involved "with its buildings and appurtenances was used for the purpose of conducting, financing, managing, supervising, directing and owning all or part of an illegal gambling business as listed in paragraph 5 above." Paragraph five added little more, merely stating that the owner of the property "was engaged in the conducting, financing, managing, supervising, directing and owning all or part of an illegal gambling business in violation of Title 18, United States Code, Section 1955." These two conclusory sentences, devoid of any specifics, provided the only rationale for the seizures.

On the basis of these cursory allegations a deputy clerk for the United States District Court for the District of Nebraska issued a Warrant for Arrest of Property in each case directing the United States Marshal to seize the named properties. The record indicates that the deputy clerk issued the warrants without any type of probable cause determination by a judicial officer or any type of preseizure hearing. The marshal complied with these warrants and seized the named properties.

Five months after the seizures the District Court entered its order dismissing the complaints and releasing the properties. There is no indication in the record of whether the inhabitants of the personal residences involved had been forced from their homes during this five month period. Judge Strom based the dismissal on his finding that "the words 'any property' in section 1955 do not encompass real property and such property was not intended by Congress to be the subject of forfeiture action." Judge Strom also held that it was "inconceivable that the intent of Section 1955 was to allow the government to seize a person's home as in these cases."

The statute relied upon by the government as authorization for the seizures states:

---

* The HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

**Prohibition of illegal gambling businesses**

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operations for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) "gambling" includes but is not limited to poolselling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein. * * *

(d) Any property, including money, used in violation of the provisions of this section may be seized and forfeited to the United States. All provisions of law relating to the seizure, summary, and judicial forfeiture procedures, and condemnation of vessels, vehicles, merchandise, and baggage for violation of the customs laws; the disposition of such vessels, vehicles, merchandise, and baggage or the proceeds from such sale; the remission or mitigation of such forfeitures; and the compromise of claims and the award of compensation to informers in respect of such forfeitures shall apply to seizures and forfeitures incurred or alleged to have been incurred under the provisions of this section, insofar as applicable and not inconsistent with such provisions. Such duties as are imposed upon the collector of customs or any other person in respect to the seizure and forfeiture of vessels, vehicles, merchandise, and baggage under the customs laws shall be performed with respect to seizures and forfeitures of property used or intended for use in violation of this section by such officers, agents, or other persons as may be designated for that purpose by the Attorney General. * * *

18 U.S.C. § 1955 (1982).

The government argues that the District Court should be reversed on the grounds that 1955(d) authorizes the forfeiture of real property by the phrase, "[a]ny property, including money, used in violation of the provisions of this section may be seized and forfeited to the United States." Appellees counter that Congress intended this language only to reach personal property. Appellees also assert that section 1955(d) is a criminal, rather than civil, forfeiture provision which accords them rights they were not given. No criminal charges or indictments had been brought under 1955 against any of the owners of the seized real property at the time this case was submitted.

## DISCUSSION

 The question of whether the forfeiture provisions of 18 U.S.C. § 1955 reach real property is an issue of first impression in this circuit. The statute was passed as part of The Organized Crime Control Act of 1970, Pub.L. No. 91–452, but has previously only been used in this circuit as authority for the seizure of the equipment and money used in illegal gambling enterprises. Attempts in other circuits to use the law to reach real property have had limited success. *See United States v. Premises and Real Property 614 Portland*, 846 F.2d 166, 167 (2nd Cir.1988), *aff'g* 670 F.Supp. 475 (W.D.N.Y.1987) (real property forfeitable); *United States v. Bonanno Organized Crime Family*, 683 F.Supp. 1411, 1460 (E.D.N.Y.1988) (real property forfeitable); *United States v. Various Denominations of Currency*, 628 F.Supp. 4, 8 (S.D.W.Va.1984) (real property forfeitable); *United States v. Bldg. & Prop. Known as 123, etc.*, 527 F.Supp. 1167, 1168 (W.D.Pa.1981) (real property not forfeitable); *DiGiacomo v. United States*, 346 F.Supp. 1009, 1012 (D.Del.1972) (real property not forfeitable).

We begin our analysis of whether the forfeiture provisions of section 1955(d) reach real property by recognizing that "[f]orfeitures are not favored; they should be enforced only when within both letter and spirit of the law." *United States v. One Ford Coach*, 307 U.S. 219, 226, 59 S.Ct. 861, 865, 83 L.Ed. 1249 (1938). Thus, courts faced with a novel or expansive reading of a forfeiture provision must review both the language of the statute and its legislative history to insure that such an expansion fits within both the "letter and spirit of the law." We look first to the letter of section 1955.

### 1. *The Plain Meaning Argument*

The main argument offered by the government for the proposition that real property is forfeitable under this law is simple, but powerful. The statute, by its terms, states that "[a]ny property, including money, used in violation of the provisions of this section may be seized and forfeited to the United States." Thus, the government argues, as the general meaning of the phrase "any property" would include real property, the statute should be read as reaching real property.

Appellees contend that the plain meaning argument fails on several counts. First, they argue that it fails to acknowledge that the statute adopts the provisions of the customs laws, which relate only to personal property, to provide the mechanics for any forfeitures. Appellees also assert that because Congress routinely specifies that a forfeiture provision reaches real property when it intends such an outcome, the lack of such specificity in this statute is evidence that it did not intend the law to reach real property. Finally, appellees argue that the decision of Congress not to amend section 1955 to specifically include real property when it made such amendments to related laws is evidence that the provision is not intended to reach real property. We will examine each of these arguments in the order they are presented above.

### The Incorporation of the Customs Laws Provisions

We find that appellees' argument concerning section 1955's incorporation of the customs laws' forfeiture mechanisms does have some merit. By their nature, the customs procedures adopted by the statute involve personal and not real property. *See, Bonanno*, 683 F.Supp. at 1459; *DiGiacomo*, 346 F.Supp. at 1011. They are neither structured nor well tailored for the forfeiture of real property. Consequently, it would make little sense for Congress to incorporate these provisions unless it expected that the seizures under the provisions would be of personal property. However, it is also true that the forfeiture provisions of the customs laws have been used by Congress to provide the forfeiture framework in some statutes which do specifically allow the forfeiture of real property, although the provisions were supplemented by additional provisions which better adapted the provisions to real property. *See* 21 U.S.C. §§ 853 & 881 (Supp. IV 1986); 18 U.S.C. § 1963(b) & (h) (Supp. IV 1986).

We resolve the conflict between these two points by finding that the adoption of the provisions relating only to personal property without any supplemental provisions relating to real property does indicate, at a minimum, that Congress expected the majority of forfeitures under the statute to be against personal property. We find that it also clearly establishes a real question as to whether Congress intended real property to ever be forfeitable under the statute. However, we also find that the incorporation of the customs laws provisions, by itself, is insufficient evidence on which to base a holding that real property is not forfeitable under the statute.

### Other Federal Statutes

The comparison between section 1955 and other federal statutes which allow the forfeiture of real property also provides evidence that Congress may not have intended the phrase "any property" to include "real property". This Court is aware of only two other statutory provisions under which federal courts have sanctioned the forfeiture of real property without the statute specifically referring to real proper-

ty. The two provisions were the original versions of 18 U.S.C. § 1963(a) (1970), a provision related to Racketeer Influenced and Corrupt Organizations (RICO), and 21 U.S.C. § 848(a) (1970), a provision related to Continuing Criminal Enterprises (CCE). Both of these provisions were amended in 1984 to specifically refer to real property by the Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, 98 Stat. 1976. In every other instance the Court is aware of, the forfeiture of real property has not been allowed without specific Congressional authorization. The court decisions allowing real property forfeiture under these two statutes all occurred after the enactment of section 1955.

The fact that federal courts, when section 1955 was drafted, had never allowed the forfeiture of real property without express Congressional authorization to forfeit "real property" is relevant because it indicates that Congresspersons drafting the language may not have even considered the possibility that any nonspecific forfeiture provision could be interpreted as reaching real property. Thus, Congress may have used the phrase "any property" in section 1955 without any conception that the phrase would or could be used to try to forfeit real property. Obviously the mere possibility that Congress may have engaged in such careless drafting based on prior court interpretations of forfeiture provisions does not by itself warrant a decision to narrowly interpret the language at issue. However, it is yet another factor which compels us to closely examine the legislative history of the provision for any evidence of its meaning, and which counsels against basing our statutory interpretation on the face of the statute alone.

Appellant argues that the failure to specifically refer to real property is irrelevant in light of the court decisions allowing the forfeiture of real property under the original RICO and CCE forfeiture provisions. We disagree for two reasons. First, the language in those two statutes was arguably more inclusive than that at issue here. The two provisions provided that a person convicted under the statutes "shall forfeit to the United States * * * any interest in

* * * property or contractual rights of any kind * * *." 21 U.S.C. § 848 (1970); 18 U.S.C. § 1963 (1970). Secondly, the courts reviewing these statutes found nothing in their legislative history meriting a narrow interpretation, a situation which further analysis will show is not present here. *See United States v. Godoy*, 678 F.2d 84, 86–87 (9th Cir.1982) (legislative history of RICO established intent by Congress for RICO forfeiture provision to reach commercial real estate).

### The 1984 Amendments to RICO and CCE

Appellees' arguments concerning Congressional action in 1984 to amend the forfeiture provisions of RICO and CCE to specifically include real property are not convincing to this court. Appellees argue, and the district court largely agreed, that Congress' failure to similarly amend section 1955 when it amended these related statutes is evidence that Congress did not want section 1955 to reach real property. The forfeiture provisions of section 1955, RICO and CCE were all initially enacted in 1970.

The thrust of our inquiry must be what Congressional intent was in 1970 when it passed the statute at issue, not what it was in 1984 when it amended related bills. The "views of the subsequent congress form a hazardous basis for inferring the intent of an earlier one." *Russello v. United States*, 464 U.S. 16, 26, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983) (quoting *Jefferson County Pharmaceutical Assn. v. Abbott Laboratories*, 460 U.S. 150, 165 n. 27, 103 S.Ct. 1011, 1021 n. 27, 74 L.Ed.2d 882 (1960)). Thus, we disagree with the district court's discussion on this issue.

### The Legislative History of Section 1955

Our analysis of the preceding arguments establishes that by themselves they are insufficient justification to warrant a construction of the phrase "any property" which excludes real property per se. However, this analysis also raises sufficient questions about the intended meaning of

the phrase in this statute to merit a searching examination of the legislative history of this provision to determine whether the expansion in use sought by the government is justified. Therefore, we turn from the letter of section 1955, to its spirit.

Section 1955 traces its history back to the "Illegal Gambling Business Control Act of 1969" introduced on April 29, 1969 as Senate Bill 2022, 91st Congress., 1st Sess. This bill was equivalent in most respects to its eventual offspring, 18 U.S.C. § 1955, with one major exception—S. 2022 contained no forfeiture provisions. S. 2022 was one of a number of bills relating to organized crime activities and related areas of criminal laws and procedures before the Committee on the Judiciary of the United States Senate in 1969. The main bill under consideration by the committee was S. 30. *See, Measures Relating to Organized Crime: Hearings on S. 30, S. 974, S. 975, S. 976, S. 1623, S. 1624, S. 1861, S. 2022, S. 2122, and S. 2292 Before the Subcomm. on Criminal Laws and Procedures of the Senate Comm. on the Judiciary,* 91st Cong., 1st Sess. (1969) [hereinafter *Hearings*].

The hearings on S. 2022, conducted on June 3rd and 4th, 1969, indicate that the bill was drafted by the United States Department of Justice. During these hearings Senator John McClellan, Chairman of the Subcommittee on Criminal Laws and Procedures of the Committee on the Judiciary, brought the lack of any forfeiture provision in the statute to the attention of Mr. Will Wilson. Wilson, the Assistant Attorney General, Criminal Division, was representing the Justice Department at the hearing. The relevant dialogue was as follows:

> Senator McClellan: I take it that you hope this legislation dealing with gambling will strike at the economic basis of organized crime. Now, would it be helpful to add to S. 2022 a forfeiture provision that would cover the equipment, adding machines, and money used in operating the illegal business establishment?
>
> Mr. Wilson: I think it would, yes.

Senator McClellan: Give us some thoughts on this.

Mr. Wilson: Well, we will do that and submit some language on that.

*Hearings* at 397 (emphasis added).

Wilson followed through on this commitment by sending a letter to the committee on July 18, 1969 with proposed wording for the forfeiture provision. The letter, which the committee made a part of the record of the hearings, stated:

> During my appearance before the Subcommittee on June 3rd, and during my discussion of S. 2022, which would make it unlawful to participate in an illegal gambling business, I agreed at your suggestion to draft a forfeiture provision which would cover the equipment or money used in the operation of such an illegal gambling business. I am, therefore, pleased to submit the following provision as an amendment to Title II of S. 2022 which it is believed will accomplish the objective sought:
>
> "(e) It shall be unlawful to have or possess any property including money, intended for use in the violation of this Section or which has been so used, and no property rights shall exist in any such property. Such property shall be seized and forfeited to the United States. A search warrant may issue as provided in chapter 205 of Title 18 of the United States Code and the Federal Rules of Criminal Procedure for the seizure of such property."
>
> "All provisions of law relating to the seizure, summary and judicial forfeiture procedures, and condemnation of vessels, vehicles, merchandise, and baggage for violation of the customs laws; the disposition of such vessels, vehicles, merchandise, and baggage or the proceeds from the sale thereof; the remission of mitigation of such forfeitures; and the compromise of claims and the award of compensation to informers in respect of such forfeitures shall apply to seizures of this section, insofar as applicable and not inconsistent with the provisions hereof; Provided, that such duties as are imposed upon the collector of customs or any

other person in respect to the seizure and forfeiture of vessels, vehicles, merchandise, and baggage under the customs laws shall be performed with respect to seizures and forfeitures or property used or intended for use in violation of this section by such officers, agents, or other persons as may be designated for that purpose by the Attorney General."

Please advise me if I can be of further assistance to the Subcommittee in connection with these matters.

*Hearings* at 411–412 (emphasis added).

On December 18, 1969, the Committee on the Judiciary reported an amended S. 30 out of committee with a favorable recommendation. The bill, now labeled the Organized Crime Control Act of 1969, was in the form of a substitute which incorporated the provisions of many of the separate bills which had been before the committee, including the organized gambling provisions of S. 2022. *See* S.Rep. No. 617, 91st Cong., 1st Sess. 1 (1969). The incorporated version of S. 2022 now included the same basic forfeiture provision recommended by the Justice Department, although the wording had been slightly rearranged to limit its application to "[a]ny property, including money, used in violation of the provisions of this section", thus eliminating property merely intended for use. *See id.* at 17. The bill specified that the forfeiture provision was to be codified as 18 U.S.C. § 1955(d). The report accompanying this bill included a copy of the letter cited above stating that the purpose of the forfeiture provision was to cover "equipment or money" used in the gambling operation. *Id.* at 131.

Senate Bill 30 did not pass during the 1969 session of Congress but was reintroduced the following year as The Crime Control Act of 1970 with the identical forfeiture provision related to organized gambling. The bill was enacted on October 15, 1970, and the forfeiture provision at issue became law at 18 U.S.C. § 1955(d).

The references cited above are the only references in the entire legislative history which indicate the intended scope of section 1955's forfeiture provision and of the in-tended meaning of the phrase "any property, including money". There is no indication that Congress ever considered that the language would allow the seizure of properties beyond those specified by the Justice Department. Absolutely no mention is made of the possibility that the language could or would be used to seize real property.

We find that this legislative history, when viewed in light of the ambiguities previously pointed out in the discussion of the text of the statute, establishes that Congress never intended the statute to be used to seize real property. Instead, it is clear to this court that the purpose of the provision was to be that represented by the Justice Department, a means of seizing the "equipment or money used in the operation of" an illegal gambling business prohibited under section 1955.

The government contends we should construe section 1955 to include real property regardless of the legislative history, thereby ignoring its representation to Congress at the time the bill was drafted that the provision would only "cover the equipment or money" used in gambling. This is unconvincing for several reasons. As we noted at the beginning of our analysis, forfeitures are disfavored and should be enforced only when within both the letter and spirit of the law. In this case the legislative history establishes that it would be beyond the spirit of the law to enforce a forfeiture against real property under section 1955. Additionally, the letter of the law fails to provide completely adequate mechanisms for the forfeiture of real property. Accordingly, we affirm the order of the district court holding that real property is not forfeitable under section 1955(d). We note that all courts which have come to a contrary conclusion failed to consider the legislative history cited above.

### 2. The Failure to Establish Probable Cause

Alternatively, our examination of the record also establishes that even if our interpretation of section 1955 is in error, the forfeitures at issue here would have to

be dismissed because the procedures employed by the government were constitutionally deficient. The deficiency was the failure of the government to obtain a determination from a judicial officer that probable cause existed to seize the properties prior to the seizures. Our examination of this issue grows out of appellees' assertion that the forfeiture provision at issue is criminal, not civil, and that they were not afforded the constitutional rights such a classification requires.

The only authority we find in support of the proposition that section 1955(d) is a criminal rather than civil forfeiture provision is the concurring opinion of Judge Merritt in *United States v. U.S. Currency*, 626 F.2d 11 (6th Cir.1980), *cert. denied*, 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 290 (1980). Judge Merritt cites as authority for this conclusion: the fact that the forfeiture provision appears within the criminal code; and recent Supreme Court caselaw establishing that forfeiture " 'proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offenses committed by him, though they may be civil in form, are in their nature criminal for Fifth Amendment purposes.' " *Id.* at 18 (Merritt, J., concurring) (quoting *United States v. U.S. Coin & Currency*, 401 U.S. 715, 718, 91 S.Ct. 1041, 1043, 28 L.Ed.2d 434 (1970)). The only reference in the bill or legislative history dealing with the classification of the provision states that "property used in violation of the provision may be seized and civilly forfeited to the United States." H.R.Rep. No. 1549, 91st Cong., 2nd Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News 4007, 4009.

We find that the provision is technically a civil forfeiture provision. Courts have routinely treated the measure as such and the legislative history indicates that this treatment is correct. We believe Judge Merritt misreads recent Supreme Court case law dealing with forfeitures of the type at issue here. Our reading of these cases indicates that the criminal nature of such provisions does not convert them from civil to criminal, but instead merely mandates that individuals whose property is being taken pursuant to such provisions

are entitled to certain constitutional protections. However, although we disagree with the specific ruling of Judge Merritt, we find that the caselaw he discusses does provide some constitutional protections to appellees in this case which they were not afforded.

■ In *Plymouth Sedan v. Pennsylvania* the Supreme Court held via an 8-1-0 vote that Fourth Amendment protections were available to a party whose property was being seized pursuant to a civil forfeiture provision which was quasi-criminal in character. 380 U.S. 693, 700-01, 85 S.Ct. 1246, 1250-51, 14 L.Ed.2d 170 (1964). The Court defined forfeiture proceedings as being "quasi-criminal" when their object "is to penalize for the commission of an offense against the law." *Id.* at 700, 85 S.Ct. at 1250. *See also Boyd v. United States*, 116 U.S. 616, 634, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1985). Section 1955(d) is clearly such a quasi-criminal provision. *See United States v. Life Ins. Co. of Virginia*, 647 F.Supp. 732, 741 (W.D.N.C.1986). Accordingly, Fourth Amendment prohibitions apply to forfeiture proceedings under this law.

■ The Fourth Amendment to the United States Constitution guarantees that:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Fifth Amendment guarantee that "[n]o person shall * * * be deprived of life, liberty, or property, without due process of law" also provides protection for property owners whose property is forfeited under quasi-criminal forfeiture statutes. *See generally, Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1973) (due process rights not violated by seizure of movable vessel without prior notice and hearing because forfeiture proceedings against mova-

ble vessel present extraordinary situation). Implicit in the analysis engaged in by the *Calero–Toledo* Court is the fact that, at the very minimum, the Constitution requires that forfeiture proceedings accommodate property owner's due process rights unless "legitimate purposes" are "served" by the failure to provide such accommodation. *Id.*, 416 U.S. at 679–80 & 689–90, 94 S.Ct. at 2089–90 & 2094–95.

The Warrant clause of the Fourth Amendment requires that, absent exceptional circumstances, a detached judicial officer—either a magistrate or judge—must, prior to the issuance of a warrant for arrest or seizure, determine whether probable cause exists for the issuance of the warrant. *Coolidge v. New Hampshire*, 403 U.S. 443, 453, 91 S.Ct. 2022, 2031, 29 L.Ed.2d 564 (1970); *Spinelli v. United States*, 393 U.S. 410, 415, 89 S.Ct. 584, 588, 21 L.Ed.2d 637 (1968); *Warden v. Hayden*, 387 U.S. 294, 309–10, 87 S.Ct. 1642, 1651–52, 18 L.Ed.2d 782 (1966); *Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 368–369, 92 L.Ed. 436 (1947). The amendment requires that a "neutral and detached" judicial officer determine whether probable cause exists because the rights at issue are too important to be judged by officers "engaged in the often competitive enterprise of ferreting out crime". *Johnson*, 333 U.S. at 14, 68 S.Ct. at 369.

The principle behind the warrant requirement is that every citizen is entitled to security of his person and property unless and until an adequate justification for disturbing that security is shown. Thus, the government must be able to demonstrate its interest in people, places or things before using its power to disturb them.

It is also established that probable cause cannot "be made out by affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists." *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1964). Instead, "[r]ecital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not merely serve as a rubber stamp for the police." *Id.* at 109, 85 S.Ct. at 746. *See also Hayden*, 387 U.S. at 309, 87 S.Ct. at 1651. No distinction is made under the Fourth Amendment between seizures to secure evidence and seizures to secure instrumentalities. *Hayden*, 387 U.S. at 310, 87 S.Ct. at 1651.

In this case there was no probable cause determination by a judicial officer. The warrants allowing the seizure of the property were issued by a deputy clerk based on complaints which merely restated the words of the statute in general cursory allegations—a fact cited by several of the appellees in their motions to dismiss as grounds for dismissal. This failure was clearly a constitutional violation putting the seizures beyond those authorized by the law. As the district court recognized, it is "inconceivable" that the statute allows "the government to seize a person's home as in these cases." Our holding on this issue is supported by other courts which have looked at this specific issue. *See United States v. Property at 4492 So. Livonia Rd.*, 667 F.Supp. 79, 84 (W.D.N.Y. 1987) (requirements of due process not satisfied "if seizure of real property takes place pursuant to a warrant issued solely by a clerk without the benefit of a probable cause determination by a judicial officer"); *United States v. Life Ins. Co. of Virginia*, 647 F.Supp. 732, 742 (1986) (Fourth Amendment requires, at a minimum, that United States Attorney secure an in rem warrant from a magistrate or district court judge who has made a probable cause determination before seizing real property).

We are cognizant, in making this holding, that the Supreme Court has held that in limited circumstances constitutional rights may be accommodated in forfeiture proceedings. *See Calero–Toledo*, 416 U.S. at 679, 94 S.Ct. at 2089. However, the argument that the *Calero–Toledo* holding forecloses the need for a probable cause determination by a detached judicial officer in this case miserably misreads the holding and rationale in that case.

The issue in *Calero–Toledo* was whether there was a constitutional requirement of preseizure notice and adversary hearing

prior to the seizure and forfeiture by Puerto Rican authorities of a yacht being used in violation of drug laws. 416 U.S. at 676–80, 94 S.Ct. at 2088–90. The Court based its findings that no such requirement existed on a combination of three factors: (1) the seizure served significant governmental purposes; (2) these purposes might be frustrated by preseizure notice and hearing because the property involved was "of a sort that could be removed to another jurisdiction, destroyed, or concealed if advance warning of confiscation were given"; and (3) the seizure was initiated by Commonwealth officials rather than self interested private parties. *Id.* at 679, 94 S.Ct. at 2089. The third factor was important to the Court, in part, because "the Fourth Amendment * * * guarantees that the State will not abdicate control over the issuance of warrants and that no warrant will be issued without a prior showing of probable cause." *Id.* at 679–80 n. 14, 94 S.Ct. at 2089–90 n. 14 (quoting *Fuentes v. Shevin*, 407 U.S. 67, 94 n. 30, 92 S.Ct. 1983, 2001 n. 30, 32 L.Ed.2d 556 (1971)).

This analysis in no way negates the right to an ex parte probable cause determination by a detached judicial officer prior to the seizure of real property pursuant to section 1955 because the interests served by such seizures are not frustrated by adherence to this constitutional principle. Such a procedure does not give "advance warning of confiscation" to anyone and the property involved is not "of a sort" that could easily be removed, destroyed or concealed even with advance warning. Nor does it unduly delay seizure.

One cannot conscientiously read the *Calero–Toledo* opinion without concluding that legitimate purposes must be served by any accommodation of due process rights in forfeiture proceedings. Yet, no such purpose exists in this case. The interests served by the forfeiture provision would in no way be frustrated by such a requirement. Indeed, the only result we can envision from compliance with this basic constitutional tenet is the increased possibility that government officials will not seize property in which they have no legitimate

interest—the very purpose of the warrant clause.

Additionally, the involvement of the government in this forfeiture lacks the relevance which the Court gave it in *Calero–Toledo* because the government's actions in this case lack the very safeguards cited by the Court as the reasons warranting deference. The Court justified its deference to government forfeiture actions in *Calero–Toledo* on the basis of the Fourth Amendment's requirement that the government establish probable cause prior to any seizure. *Id.* at 679–80 n. 14, 94 S.Ct. at 2089–90 n. 14. It would be a strange anomaly to now interpret that decision as support for the proposition that the government does not need to establish probable cause prior to seizures under forfeiture provisions because we give deference to forfeiture actions brought by the government.

Finally, the need for adherence to the constitutional requirement of having a probable cause determination by a judicial officer is clearly established by the facts in this case. The failure to honor these rights allowed a five month seizure of citizens' homes and other real property based upon allegations devoid of specifics and on the basis of a statute which does not authorize the seizure or forfeiture of real property. Sanctioning such governmental activity would make a nullity and mockery of the Fourth and Fifth Amendment guarantees at issue here. This we refuse to do.

Our holding on this issue is limited to the specific fact situation presented to this court and offered only as an alternative ground supporting the district court's dismissal of the forfeiture complaints. We make no determination of whether exigent circumstances could ever exist in other cases which would allow the seizure of real property without a preseizure probable cause determination by a judicial officer, although we are unable to imagine what such circumstances could be. Thus, we do not reach the question of whether we disagree with the holding in *United States v. A Single Family Residence* that such a forfeiture under drug laws which specifically provide for no probable cause deter-

mination is constitutional. 803 F.2d 625 (11th Cir.1986). We do note however, that we disagree with that court's conclusion that a footnote in *United States v. $8,850 in United States Currency*, 461 U.S. 555, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1982), establishes that no judicial determination of justification is ever constitutionally required prior to the governmental seizure of items for forfeiture. *A Single Family Residence*, 803 F.2d at 632. A complete reading of the footnote in *$8,850 in United States Currency,* which by the terms of the opinion is dictum, indicates that its focus is limited to the recognition that a forfeiture proceeding may, depending on the circumstances, constitute the type of "extraordinary situation" in which a seizure can legally occur without preseizure notice and adversary hearing. 461 U.S. at 562 n. 12, 103 S.Ct. at 2011 n. 12. We also take no position with regards to the First Circuit's holding that prior to seizing real property for forfeiture the government must, in addition to obtaining a probable cause determination from a judicial officer, afford the property owners a preseizure adversary hearing unless it can also demonstrate to the officer that preseizure notice would likely render the property unavailable for forfeiture and that less restrictive means to protect the legitimate governmental interest in the property do not exist. *Application of Kingsley,* 802 F.2d 571, 580, 583 (1st Cir.1986) (Coffin, J., concurring) (Torruella, J., dissenting).

The judgment of the District Court dismissing the complaints is affirmed.

FAGG, Circuit Judge, dissenting.

I believe Congress' statement in section 1955(d) that "[a]ny property * * * used in [an illegal gambling business] may be seized and forfeited to the United States" plainly permits the government to forfeit real property. 18 U.S.C. § 1955(b) (1982). Thus, following the Second Circuit's lead in *United States v. The Premises & Real Property at 614 Portland Avenue,* 846 F.2d 166, 167 (2d Cir.1988) (per curiam), *aff'g* 670 F.Supp. 475 (W.D.N.Y.1987), I would reverse the district court's order dismissing the government's forfeiture ac-

tions and remand for further proceedings on the government's complaints for forfeiture.

Settled rules of statutory construction control the issue before the court. Our task is to carry out congressional intent. *United States v. James,* 478 U.S. 597, 612, 106 S.Ct. 3116, 3125, 92 L.Ed.2d 483 (1986); *United States v. Jones,* 811 F.2d 444, 447 (8th Cir.1987). To that end, if Congress has not defined a statutory term, we must assume Congress gave well-established words their ordinary meaning. *See James,* 478 U.S. at 604, 106 S.Ct. at 3121; *Jones,* 811 F.2d at 447. In this instance, the ordinary meaning of the word "property" includes both real and personal property. *See* Black's Law Dictionary 1095 (5th ed. 1979); Webster's Third New International Dictionary 1818 (1981). Furthermore, Congress' use of the word "any" to describe property "undercuts a narrow[er] construction." *James,* 478 U.S. at 605, 106 S.Ct. at 3121. Finally, we may not ignore a statute's plain meaning unless the legislative history unquestionably shows a clear statement of contrary intent. *Burlington N.R. R. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 461, 107 S.Ct. 1855, 1859, 95 L.Ed.2d 404 (1987); *James,* 478 U.S. at 606, 106 S.Ct. at 3122.

The court initially takes up a laundry list of collateral matters, *ante* at 1365–66, that it admits is "insufficient justification to warrant a construction of the phrase 'any property' [that] excludes real property," *id.* at 1366. Regardless of this admission and section 1955(d)'s plain language, the court nevertheless concludes the "legislative history, when viewed in light of [those matters] * * * establishes that Congress never intended the statute to be used to seize real property," *id.* at 1369. *But see United States v. The Premises & Real Property at 614 Portland Ave.,* 670 F.Supp. 475, 477–78 (W.D.N.Y.1987), *aff'd,* 846 F.2d 166, 167 (2d Cir.1988). We are not permitted, however, to look beyond a statute's plain terms and delve into its legislative history in order to generate an ambiguity that is not present in the statute in the first place. *See Unit-*

*ed States v. Harvey,* 814 F.2d 905, 916 (4th Cir.1987). The court's methodology simply turns the process of statutory construction on its head and sidesteps an otherwise inescapable result.

In any event, I do not believe the legislative history of section 1955 supports the court's position. Although the court acknowledges the relevant history is sparse, *see ante* at 1368, it nevertheless concludes that a single exchange between one senator and an assistant attorney general dictates the result it reaches. *See id.* at 1367–68. I am not convinced.

After appearing before the subcommittee considering the bill, the assistant attorney general responded to a senator's request for proposed statutory language that would permit forfeiture of several items of personal property. *See id.* In doing so, the suggested language he ultimately supplied—"any property"—was significantly broader and in no way excluded real property. *See id.* at 1367. The full committee adopted this language and, five months later, forwarded the bill for consideration. *See id.* at 1367. Ten months after that, Congress enacted the forfeiture provision, leaving the "any property" language intact. *See id.* at 1368. The legislative history contains no indication that either the committee or Congress gave this language anything other than its plain, ordinary meaning. As the Supreme Court has aptly observed, " '[t]he plain words and meaning of a statute cannot be overcome by a legislative history [that] * * * may furnish dubious bases for inference in every direction.' " *Ex Parte Collett,* 337 U.S. 55, 61, 69 S.Ct. 944, 947, 93 L.Ed. 1207 (1949) (quoted citation omitted).

In sum, I do not believe this unrevealing legislative history justifies departing from section 1955(d)'s ordinary meaning. *See James,* 478 U.S. at 606, 106 S.Ct. at 3122. Even if the isolated dialogue relied on by the court "raises * * * questions," *ante* at 1367, the answers to those questions are inconclusive at best, *see Burlington N.R.R.,* 481 U.S. at 461, 107 S.Ct. at 1859. When that is the case, we carry out Congress' purpose by adhering to "the plain language of the statute itself." *United States Marshals Serv. v. Means,* 741 F.2d 1053, 1056 (8th Cir.1984) (en banc). Thus, in my view, the words "any property" in section 1955(d) permit the government to forfeit real property under the provisions of that statute.

Finally, the alternate holding, *see ante* at 1368–72, adds nothing to the court's decision in this case. It gratuitously embraces a fourth amendment theory that was not raised in the parties' motions to dismiss or considered by the district court. Nor do the appellees specifically claim in their brief on appeal that a judicial probable cause determination was required before the forfeitures could proceed. Consequently, the alternate holding, which addresses an important constitutional application, will take the government by complete surprise, *see Hormel v. Helvering,* 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941). Indeed, the decision that the district court lacked jurisdiction over the real property sought to be forfeited under section 1955(d) brings decisionmaking to an end, and this court has no authority to issue an advisory opinion in the guise of an alternate holding. *See United States v. Taylor,* 544 F.2d 347, 349 (8th Cir.1976).

Accordingly, I respectfully dissent.