# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1491

_____

| | |
|---|---|
| Kurt Dixon; Big Mamou, Inc., | * |
| | * |
| Plaintiffs/Appellees, | * |
| | * |
| v. | * |
| | * |
| Mike Lowery, individually and in | * |
| his official capacity; Tim Calhoun, | * |
| individually and in his official capacity, | * |
| | *   Appeals from the United States |
| Defendants/Appellants, | *   District Court for the Eastern |
| | *   District of Arkansas. |
| Louie Caudell, in his official capacity | * |
| as Chief of the Little Rock Police | * |
| Department; City of Little Rock, | * |
| Arkansas, | * |
| | * |
| Defendants. | * |

_____

No. 01-1632

_____

| | |
|---|---|
| Kurt Dixon; Big Mamou, Inc., | * |
| | * |
| Plaintiffs/Appellants, | * |
| | * |
| v. | * |
| | * |
| Mike Lowery, individually and in | * |
| his official capacity; Tim Calhoun, | * |

individually and in his official capacity,   *
Louie Caudell, in his official capacity    *
as Chief of the Little Rock Police     *
Department, City of Little Rock,      *
Arkansas,       *
      *
        Defendants/Appellees.     *

_____

Submitted: December 11, 2001

Filed: August 16, 2002
_____

Before MORRIS SHEPPARD ARNOLD, BEAM, and RILEY, Circuit Judges.

BEAM, Circuit Judge.

Mike Lowery and Tim Calhoun (appellants) appeal from the district court's denial of their motion for summary judgment. They argue that they are entitled to qualified immunity from suit by Kurt Dixon and the Big Mamou, Inc. (collectively referred to as "Dixon") because they did not violate a clearly established constitutional right when they helped a private party acquire possession of the Big Mamou–a restaurant that had been owned and operated by Dixon–and that their acts did not constitute an unreasonable seizure of property under color of state law. Dixon cross-appeals the district court's grant of summary judgment in favor of the City of Little Rock (the City) and its chief of police. Among other contentions, Dixon argues that the City and police chief ratified the acts of the law enforcement officers when they allowed the officers to remain at the Big Mamou in the face of his complaints that he was being improperly deprived of the property. We affirm in part and remand in part.

## I.    BACKGROUND

Dixon operated the Big Mamou restaurant in Little Rock, Arkansas. Aaron Omar (Omar) approached Dixon about consolidating the Big Mamou with a daiquiri bar chain. Under this arrangement, Dixon would own forty-nine percent of the new establishment and would be paid a salary, and remodeling would be done in a manner that would not interfere with the restaurant's operations. Dixon was to continue operating the Big Mamou at all times. On the condition that Omar would present Dixon with proof of his forty-nine percent ownership and a note in the amount of $25,000 in order to close the deal, Dixon signed an asset purchase and sale agreement with the closing date left blank, a bill of sale, an assignment of lease, and a letter authorizing Omar's company to use the Big Mamou's business and liquor licenses. Omar and his business partner told Dixon they would send him a copy of the paperwork and advise him of the closing date, but failed to do so. Dixon repeatedly demanded that Omar provide him with a copy of the preliminary and executed documentation, but Omar refused.

Omar later pressured one of Dixon's employees into giving him a key to the Big Mamou. Dixon still had not received documentation of his ownership or consideration for the transaction when he learned that Omar had obtained a key. Consequently, Dixon changed the locks to the restaurant. Omar learned that his key to the Big Mamou no longer worked and confronted Dixon. Dixon demanded the documentation to close the transaction, and Omar threatened to tear up all existing paperwork and then left.

Omar subsequently sought the assistance of his friend, Harold Allison, who was with the enforcement division of Arkansas Alcohol Beverage Control, and together they contacted Captain Lowery at police headquarters. According to Lowery, Omar said that "he needed to hire some off-duty officers to go out [to the Big Mamou] and stand by while the locksmith changed the locks, and then he wanted the

officers to secure the business because he had valuable equipment in there and he was going to close the business and renovate it." Lowery accepted Omar's offer of employment but did not further investigate Omar. Lowery approved his own off-duty employment and that of Sergeant Calhoun.[1]

Lowery and Calhoun proceeded to the Big Mamou in city police cars and were the first to arrive at a parking lot near the Big Mamou. When Omar and a locksmith arrived, Lowery and Calhoun, wearing their uniforms, badges, and side arms, accompanied them to the restaurant. Officers asked employees of the Big Mamou how many exits were in the restaurant and where they were located. Lowery and Calhoun stood watch while the locksmith changed the locks. Lowery also stood watch while one of Omar's business associates placed a closed sign on the restaurant's door. Calhoun accompanied Omar, Omar's business associate, and their attorney into the restaurant. When an employee went into the kitchen to telephone Dixon, an officer followed the employee. Lowery and Calhoun told employees that they needed to leave the restaurant. They also stood watch while the workers gathered their belongings and left. Officers escorted employees to the front door of the restaurant and locked the door behind them. Some of the officers stayed inside. Lowery and Calhoun took possession of the keys to the restaurant when Omar left. After Omar departed, Dixon and his family arrived and found the door was locked. Lowery and Calhoun allowed them inside for about ten minutes. All of Dixon's business records remained inside the restaurant and, under the officers' watch, fixtures and personal property were removed.

---

[1]Although Lowery also arranged for eight other officers' off-duty employment at the Big Mamou, and other officers were involved on the date Dixon was dispossessed of the Big Mamou, this appeal only involves Lowery and Calhoun. Nonetheless, given that we are reviewing issues arising from appellants' motion for summary judgment, we draw all inferences in favor of the non-moving parties. Avemco Ins. Co. v. Auburn Flying Serv., Inc., 242 F.3d 819, 821 (8th Cir. 2001); Walden v. Carmack, 156 F.3d 861, 869 (8th Cir. 1998).

Dixon filed a complaint with the Internal Affairs Division of the Little Rock Police Department and he and his employees had given statements to Internal Affairs by December 11, 1998. On December 17, 1998, Omar gave a statement to the Internal Affairs Division, revealing that, under the contract between himself and Dixon, he owed Dixon $25,000. Lowery and Calhoun, along with other Little Rock law enforcement officers, maintained their "off-duty" employment at the Big Mamou until December 31, 1998, when Dixon filed suit and the chief of police told them to terminate their work at the Big Mamou.

## II.     DISCUSSION

### A.     Standards

Summary judgment is appropriate if the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact regarding the qualified immunity defense and that the moving party is entitled to judgment as a matter of law. Walden v. Carmack, 156 F.3d 861, 868 (8th Cir. 1998). More specifically, we must determine if appellants have established that there are no genuine issues of material fact as to whether Dixon asserted a violation of a federal right and whether that right was clearly established. Id. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 121 S. Ct. 2151, 2156 (2001). When various courts have determined that certain factually similar conduct is a constitutional violation, the constitutional right to be protected against such conduct is considered clearly established even if courts have not agreed upon a precise formulation of the violation. Id. at 2157.

## B. Constitutional Violations and Reasonableness

Dixon has asserted a violation of his constitutional right to be free from unreasonable search and seizure under the Fourth and Fourteenth Amendments. He claims that the officers unlawfully seized his real and personal property and remained in possession of that property for some time after the initial seizure.

Among other safeguards, the Fourth Amendment protects against unreasonable seizures of property. U.S. Const. amend. IV; Soldal v. Cook County, 506 U.S. 56, 61-62 (1992). A seizure of property occurs when "'there is some meaningful interference with an individual's possessory interests in that property.'" Id. at 61 (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984)). It is well settled that a seizure carried out without judicial authorization is per se unreasonable unless it falls within a well-defined exception to this requirement. E.g., Coolidge v. New Hampshire, 403 U.S. 443, 474, 484 (1971); Lesher v. Reed, 12 F.3d 148, 151 (8th Cir. 1994); United States v. South Half of Lot 7 and Lot 8, Block 14, 876 F.2d 1362, 1371 (8th Cir. 1989); see also Soldal, 506 U.S. at 71 (stating that, had officers acted pursuant to a court order in seizing a mobile home, "a showing of unreasonableness . . . would be a laborious task indeed," and that "had the ejection . . . properly awaited the state court's judgment it [was] quite unlikely that the federal court would have been bothered with a § 1983 action alleging a Fourth Amendment violation"); Michigan v. Tyler, 436 U.S. 499, 506 (1978) (stating that, under the Fourth Amendment, "'one governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is "unreasonable" unless it has been authorized by a valid search warrant'") (quoting Camara v. Municipal Court of San Francisco, 387 U.S. 523, 528-29 (1967)). Absent exigent circumstances or a valid consent, prior to the state assisting in depriving a party of possession, a neutral officer or magistrate must determine whether there is probable cause to believe that the claiming party is entitled to the relief requested. Soldal, 506 U.S. at 66; see also Mitchell v. W. T.

Grant Co., 416 U.S. 600, 625 (1974) (plurality opinion of Powell, J.) (finding that in the due process context, constitutional requirements are satisfied where state law requires that a creditor furnish adequate security and "make a specific factual showing before a neutral officer or magistrate of probable cause" prior to the state aiding in sequestering property of a defaulting debtor, and then accords an opportunity for an adversary hearing promptly after sequestration to determine the merits of the controversy). We have said that authorizing governmental seizures to be carried out without a determination by a judicial officer could lead to improper seizures and "would make a nullity and mockery of the Fourth and Fifth Amendment guarantees" and "[t]his we refuse to do." South Half, 876 F.2d at 1371. These constitutional protections exist regardless of whether an officer is acting in a criminal or civil capacity. Soldal, 506 U.S. at 69, 71; New Jersey v. T.L.O., 469 U.S. 325, 335 (1985).

In this case, appellants, for good reason, do not challenge the established law, but instead question whether Dixon had a continuing property interest sufficient to support a constitutional violation. Lowery and Calhoun argue that documentation, including an asset purchase and sale agreement and a lease assignment, precluded Dixon from having a clear right to sole possession of the property.[2] In particular, they argue that Dixon's lease assignment to Omar demonstrates that Dixon was not deprived of a constitutionally protected property right. Appellants' Brief at 10, 13-14.

However, appellants acknowledge that Dixon had an arguable, if disputed, interest in the Big Mamou. They state that "[w]hile Dixon might have had success in setting aside the contract for sale or the assignment of the lease in an action based

_____

[2]Appellants argue that Dixon is unable to "establish his right to exclusive possession of the premises." However, he was denied *any* possession, despite the purported arrangement for him to continue to operate the restaurant while retaining a forty-nine percent interest. An interest amounting to less than *all* of the proverbial "bundle of sticks" is nonetheless a protected property interest.

upon a fraudulent inducement to sign these documents, the fact remains that until he did so, he was not clearly entitled to possession of the property *to the exclusion of Omar*." (Emphasis added). Appellants' argument misses the mark. Dixon's claim is not concerned with whether *Omar* could be excluded, but whether *Dixon* could be excluded. In that vein, appellants have conceded a great deal in stating that they "do not . . . dispute Dixon's argument that he had been tricked into signing and delivering up" the documents upon which appellants relied in assisting Omar. To borrow appellants' phrase "the fact remains" that Omar was not clearly entitled to sole possession of the property to the exclusion of Dixon.

Dixon obviously had arguable property interests. Employees alerted appellants that Dixon had not received documents necessary to finalize the arrangement and that they did not think the deal between Dixon and Omar was complete. Moreover, the purchase and sale agreement stated that the "Seller shall relinquish possession upon closing," but it was apparent that no closing had transpired, as indicated by the absence of a closing date. Also, the purchase agreement included assumption of lease obligations as only one component of the purchase price and, again, the sale had not closed.

Even if we were to presume that the deal had been consummated and that Omar had assumed the lease, the evidence is clear that Dixon still maintained an interest in various items of personal property on the premises and possibly in all aspects of the business itself. Omar had not bothered to pursue eviction through appropriate means.[3] Indeed, Omar advised the officers that he did not have a court order allowing

---

[3]To avoid unlawful dispossession, Arkansas has in place various means to determine whether a tenant is improperly holding over and to peaceably resolve such matters through legal means. See, e.g., Ark. Code Ann. § 18-16-201 (ejectment for nonpayment of rent); Bolin v. Drainage Dist. No. 17, 176 S.W.2d 143 (Ark. 1943) (unlawful detainer action); Dell v. Gardner, 25 Ark. 134 (Ark. 1867) (assumpsit action for use and occupation).

him to take possession of the premises, and there was an obvious disagreement over who was entitled to possession. Furthermore, in a deposition, Calhoun acknowledged his belief that Dixon had a possessory interest when he referred to Omar indicating that he was no longer going to "allow [Dixon] to continue to *rent*" the Big Mamou. (Emphasis added). Essentially, in the face of an apparent property dispute, appellants chose to decide on the spot who should prevail.

Appellants' argument that Dixon's property rights were not clear falls short. Even if a claim to continued possession is in dispute, that possessory interest is still constitutionally protected. Soldal, 506 U.S. at 58-59, 72; cf. Fuentes v. Shevin, 407 U.S. 67, 86 (1972) (indicating that in the context of the *Fourteenth* Amendment, the protection of "property" is not limited to "safeguard only the rights of undisputed ownership," but has been read broadly to extend protection to "'any significant property interest'" and that the appellants had been "deprived of such an interest in . . . replevied goods–the interest in continued possession and use of the goods" that they had acquired under "conditional sales contracts that entitled them to possession and use of the chattels before transfer of title" (citation omitted)); Gentry v. Lee's Summit, 10 F.3d 1340, 1344 (8th Cir. 1993) (indicating that when the government entity acted "abruptly and summarily" in the face of "evidence that might be characterized as contrary to the conclusion that . . . premises were abandoned," it "gambled that it was correct in its conclusions"). In Soldal, allegations that a trailer home was removed from a rented lot in a mobile home park, in the presence of officers who knew there was no eviction order, sufficed to constitute an actionable seizure within the meaning of the Fourth Amendment, despite the trailer having been removed pursuant to the park owner's claim that the trailer owner had failed to pay rent for the lot. 506 U.S. at 58-59, 72. In Gentry, a leasehold and trade fixtures were protected by the Constitution despite the city's belief that they had been abandoned. 10 F.3d at 1343-44. There, we concluded that the city could not "escape § 1983

-9-

liability unless [the plaintiff] had no interest for the Constitution to protect." Id. at 1345.

Although we may not require officers to "parse a state court order with the legal acumen of lawyers and federal judges," Audio Odyssey, Ltd. v. Brenton First Nat'l Bank, 286 F.3d 498, 503 (8th Cir. 2002) (4-1-4 decision) (plurality opinion of Loken, J.), we do require that, absent exigencies or consent–neither of which were present here–officers rely on the legal acumen of a neutral judicial officer in such disputes. Soldal, 506 U.S. at 66, 71-72; South Half, 876 F.2d at 1371. The Court has said, again in the context of due process, that an officer's on-site assessment is no substitute for an "informed evaluation by a neutral official." Fuentes, 407 U.S. at 83; accord Mitchell, 416 U.S. at 625. A claimant's assertions to law enforcement officers "test no more than the strength of [his] own belief in his rights." Fuentes, 407 U.S. at 83. The reasoning in due process cases like Fuentes and Gentry helps demonstrate the wisdom behind the Fourth Amendment's warrant requirement.

Appellants attempt to recast the posture of the matter by claiming that Dixon did not have a clear property right to sole possession, but what is important is that he had a property interest that was clearly in dispute. E.g., Soldal, 506 U.S. at 58-59, 71-72. Whether Dixon had a protected property interest is a material fact that is still in dispute and therefore is not an appropriate issue for summary judgment. Cf. id.; Gentry, 10 F.3d at 1345. Under the Fourth Amendment, seizure of property without a warrant, in circumstances such as those present in this case, is unreasonable. E.g., Soldal, 506 U.S. at 66, 71-72; South Half, 876 F.2d at 1371. Lowery and Calhoun admit the lack of exigent circumstances in their statement, "There was no dispute going on while [they] were there, and the actual takeover by Omar . . . was peaceful." They ask us to leave every property seller who has entered into a purchase and sale agreement, but not yet received compensation for their property, vulnerable to having their property confiscated through the assistance of law enforcement officers. We decline their invitation.

Law enforcement officers in general are well aware of the need for a neutral determination of property rights. See Jackson v. Arkansas, No. CACR96-1015, 1997 WL 556302, at *1 (Ark. App. Sept. 3, 1997) (unpublished opinion) (discussing sheriff's deputies' refusal to evict tenant because it was a "civil matter"). Remarkably, officers' awareness of the need for some judicial determination in this particular situation is validated by Calhoun's own statement to the Internal Affairs Division and an Internal Affairs report of its investigation. Calhoun stated that he and Lowery explained to Omar that the only way police could ask those in possession of property to leave was "if [the ouster] actually had an eviction notice[,] which they said they did not have." Similarly, in response to a deposition question regarding why Calhoun knew it was inappropriate to become involved in civil disputes over property, Calhoun stated "that's up to the courts to decide . . . I can't look at something . . . and decide who's right or who's wrong on civil matters." Perhaps even more telling of reasonable officers' knowledge is the Internal Affairs report, which states that "[t]he general isolation of municipal police officers in civil or chancery matters such as evictions and/or property disputes as is clearly in evidence in this matter is so well established as to make it utterly inconceivable that two experienced, senior officers such as Captain Lowery and Sergeant Calhoun would behave as has been alleged by Mr. [Dixon]. While Captain Lowery and Sergeant Calhoun obviously assisted in securing the business after the fact, they did not close the business or evict the employees."

Although the Internal Affairs Division's analysis helps establish that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," Saucier, 121 S. Ct. at 2156, its ultimate conclusion exonerating Lowery and Calhoun is not determinative for summary judgment purposes. E.g., Avemco Ins. Co. v. Auburn Flying Serv., Inc. 242 F.3d 819, 821 (8th Cir. 2001) ("We view the facts in a light most favorable to the nonmoving party. Summary judgment may only be granted if there are no disputes concerning material facts and the moving party is entitled to judgment as a matter of law." (Citations omitted.)). The report further

indicates that various individuals' statements about what the officers did were in conflict, with some individuals indicating that the officers participated in ousting them from the premises. Such conflicting evidence on this equally material fact disqualifies the matter as one for summary judgment. Id.

It is undisputed that Lowery and Calhoun arrived at the Big Mamou in a city police car, wearing badges, uniforms, and side arms. After parking the police car in front of the restaurant's entrance, they stood watch while Omar had the locks changed. They also accompanied Omar and company into the restaurant and stood watch while employees gathered their belongings. After they helped clear the employees from the building, they took possession of the key and locked the restaurant. When the Dixons and Mrs. Dixon's parents arrived, the latter were told "I just got you all out of here and now I gotta kick all of you out again." When Dixon arrived, he found the door locked and was allowed entrance by Lowery and Calhoun for about ten minutes. They advised him that he could contact Omar and that "this whole thing was a civil process, but maybe if they could get together they could work it out without having to go to court." Although appellants cite various state cases regarding the effect of an apparent lease on parties' possessory interests, they fail to acknowledge that which they have previously recognized–that law enforcement officers are not the appropriate arbiters of these disputed interests.

Unlike Audio Odyssey–where this court disagreed about whether seizure of a business pursuant to a writ of replevin for personal property was unreasonable–here there was no court order to seize any property. Cf. 286 F.3d at 502-03 (plurality opinions of Hansen, C.J., & Loken, J.) (indicating that an initial seizure of a business was constitutionally reasonable because the deputy sheriff relied on a writ of replevin). Also in contrast to that case, the officers commandeered the facility themselves to the exclusion of the current possessor, which is evidenced by their various alleged statements. For instance, when an employee attempted to turn a big screen television off, one officer is alleged to have said "no you just leave that on,

we're going to make ourselves at home, we're going to be staying here at night. And we're going to make ourselves at home." The officers continued to occupy the Big Mamou until Dixon filed suit and their superiors ordered them to terminate their employment at the Big Mamou–a period of more than three weeks.

Given the record, we find that appellants are not entitled to summary judgment on the issue of qualified immunity. Dixon has properly asserted a violation of a constitutional right and there are sufficient facts alleged to support the finding that reasonable officers in appellants' positions would have known that their conduct violated that right.

## C.    Seizure

Appellants further claim that no action taken by them resulted in the unlawful seizure of any property in which Dixon had a proveable interest, and that "[a]t all times, [they] were present only to provide security to the building and to stand by in the event there was a breach of the peace between Dixon and Omar." Given the facts we have discussed thus far, appellants' assertion is unpersuasive.

Lowery and Calhoun admit that they were present while Omar had the building re-keyed, that Omar gave them a key, that they were standing by while Omar determined that "the premises were going to be peacefully returned to him,"and that they remained at Omar's instruction to provide security overnight. They argue that it "was only after Omar . . . had stated [he] was exercising his right as the owner to close the business early[ ] and had changed the locks and left them to provide security" that ""[a]t most, [they] told people they needed to wait outside for the Dixons, or told them to get their things together and leave." In other words, appellants argue that they did not take part in seizing the property because they only asked employees to leave after Omar took over the premises. They ask us to draw a line between their actions prior to and after the locksmith changed the lock. This

we will not do. Appellants' alleged actions on both sides of and during the re-keying helped effectuate the seizure of the Big Mamou.

The facts of this case are much like those of <u>Soldal</u>. In <u>Soldal</u>, a trailer park owner alerted the sheriff's department that she was going to remove plaintiff's trailer home from the park and "requested the presence of sheriff deputies to forestall any possible resistance." 506 U.S. at 58. The deputies accompanied the park owner while her employees took possession of the trailer, and one deputy explained to the trailer owner that he was there merely to see that the trailer owner did not interfere with the park owner's work. <u>Id.</u> As earlier indicated, the Court concluded that the alleged facts sufficed to constitute a seizure within the meaning of the Fourth Amendment. <u>Id.</u> at 72. We find no meaningful distinction between the situation in <u>Soldal</u> and the one before us. Consequently, we affirm the decision of the district court denying appellants summary judgment on the issue of qualified immunity.

### D. Cross-Appeal

On cross-appeal, Dixon argues that the policies and practices of the City and police chief that allowed its supervising officers authority to determine the appropriateness of their off-duty work led to the violation of Dixon's constitutional rights. As the district court recognized, Dixon has failed to establish that the policies and actions of the City and police chief evidence deliberate indifference to the rights of individuals like Dixon. <u>See</u> <u>City of Canton v. Harris</u>, 489 U.S. 378, 388-89 (1989); <u>Thelma D. v. Board of Educ.</u>, 934 F.2d 929, 934 (8th Cir. 1991). We therefore affirm the decision of the district court on this point. <u>See</u> 8th Cir. R. 47B.

More troubling is Dixon's claim that the City and chief of police essentially ratified officers' actions when it failed to order them to cease their "round-the-clock occupation" of the Big Mamou after Dixon promptly complained to Internal Affairs about the deprivation of his property by the officers and after all of his employees had

given statements to Internal Affairs. The officers were not ordered to cease their occupation until well after Omar advised Internal Affairs that he owed Dixon $25,000 for the property. A decision by municipal policymakers on a single occasion may result in municipal liability under 42 U.S.C. § 1983 for actions it officially sanctioned or ordered. Williams v. Butler, 863 F.2d 1398, 1401 (8th Cir. 1988). Unfortunately, the record below provides us with no guidance on whether there are disputes of material facts on the issue of municipal liability for the alleged ratification of the officers' occupation. See Pembaur v. City of Cincinnati, 475 U.S. 469, 480-84 (1986); Williams, 863 F.2d at 1401. Because the court failed to respond to Dixon's complaint that the City and police department ratified the officers' actions, we remand for development of the record as to whether municipal liability may be imposed pursuant to 42 U.S.C. § 1983, and consistent with precedent, for the failure to order the officers to cease this off-duty employment earlier. See Pembaur, 475 U.S. at 480-84; Williams, 863 F.2d at 1401.

## III.  CONCLUSION

For the reasons we have stated, we affirm the decision of the district court in all respects, except as to whether summary judgment was appropriate on the issue of liability of the City and police chief for allowing the officers to maintain their employment at the Big Mamou until December 31, 1998. On the latter issue, we remand for the court to address Dixon's complaint and develop the record.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.